SYDNEY A. TABER, PROSECUTOR–APPELLANT, v. STATE BOARD OF REGISTRATION AND EXAMINATION IN DENTISTRY OF NEW JERSEY, DEFENDANT–RESPONDENT.

Argued December 20, 1948—Decided January 24, 1949.

344

*Mr. Jacob Max* argued the cause for prosecutor-appellant (*Mr. Hiram Elfenbein* on the brief).

*Mr. Joseph A. Murphy*, Assistant Deputy Attorney General, argued the cause for defendant-respondent (*Mr. Walter D. Van Riper*, Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

CASE, J. The State Board of Registration and Examination in Dentistry, after hearing, found that Dr. Sydney A. Taber, a licensed dentist of this state, had been *"employed by an unlicensed manager, proprietor, operator and conductor, as defined in Section* 45:6–19 *of Title* 45 *of the Revised Statutes,* to wit, David Locks, Dental Acceptance Co., Genessee Dental Supply Co., Arday Inc. and Arnold Park Inc.; and that said Sydney A. Taber entered into possession of such dental material and equipment as is necessary for the management of a dental office which is owned by such unlicensed manager, proprietor, operator and conductor on the basis of a lease and other agreement for compensation for the use of such material, equipment and office; and that said Sydney A. Taber entered into an arrangement by which there was made available to him, for his use, dental material, equipment and office, the ownership and control of which is retained by such unlicensed manager, proprietor, operator and conductor, and further finds that such transaction was not a bona fide sale of dental material and equipment secured by chattel mortgage or conditional sale agreement, all of which is contrary to the provisions of *Section* 45:6–7, *subdivision (h) of Title* 45 *of the Revised Statutes"*.

Following that finding, the State Board suspended Dr. Taber's license for a period of six months. Dr. Taber took the record to the former Supreme Court by writ of *certiorari*. That court decided, 135 *N. J. L.* 255, that *subdivision (h) of R. S.* 45:6–7, upon which the action was predicated, was unconstitutional and set the suspension aside. On appeal, the Court of Errors and Appeals, 137 *N. J. L.* 161, held that so much of the disputed section as provided that a license to practice dentistry might be revoked or suspended if the licensee "has been employed by an unlicensed manager, proprietor, operator or conductor as defined in section 45:6–19", (the words italicized by us above), was constitutional and remanded the record to the Supreme Court for a determination of the facts and the application thereto of the adjudicated law. Thereupon the Supreme Court, as then constituted, reviewed the proofs and found, 137 *N. J. L.* 392, that the dental office, nominally operated by Dr. Taber, was really "handled and directed by Locks or his affiliated companies" and that the prosecutor of the writ "had been employed by an unlicensed manager, proprietor, operator or conductor as defined in the statute". The judgment giving effect to that finding is before us on the appeal of Dr. Taber.

Two points are presented in appellant's brief: first, that there was no evidence of employment; second, that the board's suspension of the appellant's license was unconstitutional.

Mr. Locks is not a dentist. By his own statement he knows nothing about dentistry. His business, so he says, is the discounting of contracts. From the proofs in the case his activities go beyond that. He does business under trade names and through different corporations. He trades under the names of Dental Acceptance Company and of Genessee Dental Supply. He is president of Arday, Inc. and of Arnold Park, Inc. Those trade names and those corporations appear with interlocking effect in the testimony. So far as concerns this case they all mean Locks.

The office in question was originally managed by Dr. James A. Morton, a dentist. The matter began in this way:—Morton saw an advertisement in the New York Times calling for a dentist registered in the State of New Jersey, offering excellent

remuneration and giving a box number to which replies to the advertisement should be sent. Morton answered. He received a telegram signed with a name which he did not know and in response he went to the Waldorf Astoria Hotel, New York City, where he met the writer of the telegram, apparently a figurehead, and was introduced to Mr. David Locks. Locks asked Morton if the latter would like to operate the best equipped dental office in the State of New Jersey. Morton's testimony:—

"We talked over the plan of operation which amounted to the fact that he would, his company, the Dental Acceptance Company, of Rochester, which he told me at the time he was President of, would advance sufficient funds to set up this dental office in all phases such as rent, the equipment, the supplies that were necessary, sufficient funds to carry on and from time to time additional funds if they were required until the office was on a paying basis. * * * The Dental Acceptance Company was to advance sufficient money to carry on the operation of this office. In return the Dental Acceptance Company required that all credit accounts or budget accounts that were handled in that office be signed over to the Dental Acceptance Company at a discount rate of 35 per cent. * * * We finally agreed verbally to this plan—Mr. Locks' plan—and approximately the 12th of April, 1943, an agreement was signed in the office by me and Dave Locks in the office of Eugene Hoffman, an attorney, in Newark, New Jersey. This agreement stipulated that the Dental Acceptance Company would advance sufficient money for maintenance of this office at a discount rate, rather a down rate was to be charged on all budget accounts that were turned over to the Dental Acceptance Company. This rate was 35 per cent. There was to be retained by this company approximately 43 per cent to remain in their possession until such time as this agreement was ended—terminated. * * * The other 20 per cent was to—the other twenty some per cent was to be assigned to me in a personal account for maintenance of this office at 786 Broad Street."

The office began to operate. Dr. Taber was employed therein. Later Taber took over Morton's interest, and Morton remained as an employee in the usual manner. There was some modification in operation, but the same pattern continued. The arrangements for the transfer of interest from Morton to Taber were effected by Locks, not by negotiations between Taber and Morton. The dentist in whose name the business was conducted was little more than an office manager with a drawing account somewhat in excess of the salary of an employed dentist. The office was an advertising office. Advertising was published in

the newspapers and also over the radio. The advertising copy was arranged by Locks. Most of the dental work was done on credit-contracts and the contracts were discounted by one or another of Locks' companies at heavy rates. Supplies were procured so far as possible, and sometimes to the disadvantage and inconvenience of the office, from Locks' Genessee Supply Company. "Hiring and firing" and the fixing of salaries were, in effect, and sometimes actually, done by Locks. Locks saw that money for the pay roll was at hand on pay day to the extent that the cash receipts were inadequate. When Dr. Morton began his arrangements with Locks, the lease for the office was negotiated by Locks with the owner, was signed by Morton, guaranteed as to rent by Dental Acceptance Company and David Locks and assigned to Dental Acceptance Company. Taber, when he came in, operated some months under the same lease; then a new lease was made but it was not made to Taber. It was made by the owner to "The Dental Acceptance Company by David Locks" as tenant and "assigned" by the latter to Taber under a written consent by the landlord that the tenant might "sublet" to him. Taber paid the rental but the owner, on its books, credited the payment to the tenant named in the lease. Taber made a daily report to Arday or Arnold Park Corporation of payments on credit accounts; he admits that he acted only as agent as to them. He also sent in copies of the daily record sheets showing payments which were not on credit accounts. Dr. Taber was asked by the president of the dental board:—

"I'd like to ask why a copy of the cash account is sent to Rochester when they have no interest in the cash accounts, but only interest in the budget accounts? It's none of his business. Why should he receive that information?"

The answer given by the witness was:—

"I don't mind letting him know. He has quite an interest in seeing that the organization is running nicely. * * * The better I run that organization, the better it is for him."

The control over employments, discharges, salaries, procurement of supplies and office finance was such that in each of these several respects Taber was compelled by force of the facts to admit from time to time to those who were to be af-

fected by the announced act or omission that he was "sorry", he "would like to", he "would like not to", depending upon the problem of the moment, but that "it was Mr. Locks' order" that he should do as he was doing.

The record presents adequate evidence to support the factual findings of the Supreme Court. It does not show that Locks proposed or that Taber accepted employment by the use of that precise word. It does provide a substantial basis for concluding that Dr. Taber's control over the office and its management was subordinate, that the real operator and conductor was David Locks, who was not a licensed dentist, and that the relationship between the two constituted employment in the statutory sense.

We pass to appellant's second point.

It is apparent that the former Supreme Court addressed itself to the narrowed question of whether or not the proofs brought Dr. Taber within the application of so much of the statute *(R. S.* 45:6–7 *(h)* as amended by *chap.* 316, *P. L.* 1941, and *chap.* 193, *P. L.* 1945*)* as the Court of Errors and Appeals had found *(137 N. J. L.* 161, *supra)* to be constitutional, namely, that "any license to practice dentistry may be revoked or suspended by the board upon proof to its satisfaction that the licensee * * * has been employed by an unlicensed manager, proprietor, operator or conductor as defined in *section* 45:6–19 of this title * * *". The Supreme Court opinion concludes:—"We have no difficulty in finding that the prosecutor of this writ had been employed by an unlicensed manager, proprietor, operator or conductor as defined in the statute. Judgment, in accordance with the mandate of the Court of Errors and Appeals, shall be entered." The judgment as entered determined that "The facts justified a finding that the prosecutor had been employed by an unlicensed manager, proprietor, operator or conductor as defined in the statute, and that the action of the defendant in suspending the license of the prosecutor was proper under the statute". The judgment further directed that the proceedings and resolution of the State Board of Registration and Examination in Dentistry should "be in all things affirmed"; but this generalization was not necessary to

the decision, was not in logical sequence to the opinion and was not, we think, intended by the court. The draftsman of the judgment seems to have enlarged the same beyond the intended scope of the adjudication. The judgment should be amended to conform to the provisions of the opinion and the preceding language in the judgment itself.

The dentistry statute provides, *R. S.* 45:6–9, that on the review of the action of the dental board in revoking or suspending a license the court shall determine questions of fact as well as of law and may reverse or affirm in whole or in part the finding or determination of the board or pronounce such judgment on the evidence as shall be warranted. *Cf. Schwartz v. State Board of Registration and Examination in Dentistry,* 125 *N. J. L.* 330 *(Sup. Ct.* 1940*).* It was fully within the authority of the former Supreme Court to review the evidence, to make new findings thereon and to pronounce judgment. What it did, in our view, was within that field. It found that a violation of the cited portion of the statute had been charged against Taber, that the proofs showed the accused to be guilty thereof and that the suspension of the license for a period of six months should stand as a proper penalty; and we are in accord with that finding.

We have no occasion to review the determination of the Court of Errors and Appeals, *supra,* that the involved portion of the statute is both severable and constitutional.

The judgment below should be modified in the respect mentioned above and, as so modified, affirmed.

*For affirmance:* Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, BURLING, and ACKERSON—**5.**

*For reversal:* None.