## SUPERX DRUGS CORPORATION *v.* STATE BOARD OF PHARMACY.

### DECISION OF THE COURT.

1. MANDAMUS—DRUGGISTS—LICENSES.

   Mandamus to compel State board of pharmacy to issue license to corporate owner of pharmacy is granted.

### DISSENTING OPINION.

### DETHMERS, J.

2. DRUGGISTS—STOCK OWNERSHIP—JUDICIAL NOTICE.

   *Judicial notice is taken of the fact that, based on records of the corporation and securities commission, a named individual was owner of more than 25% of the stock of plaintiff corporation at the time of incorporation and again when the corporate life was extended 30 years later and that records of defendant*

### REFERENCES FOR POINTS IN HEADNOTES

[1] 34 Am Jur, Mandamus §§ 184, 189.
[2] 20 Am Jur, Evidence §§ 16, 18, 65, 89.
[3] 25 Am Jur 2d, Drugs, Narcotics and Poisons §§ 10, 14.
[4] 5 Am Jur 2d, Appeal and Error § 545.
[5–7] 33 Am Jur, Licenses § 52.5.
[8, 11, 47] 25 Am Jur 2d, Drugs, Narcotics and Poisons § 7.
[9, 10] 25 Am Jur 2d, Drugs, Narcotics and Poisons §§ 7, 14.
   33 Am Jur, Licenses § 52.5.
[12] 50 Am Jur, Statutes § 170.
[13] 20 Am Jur 2d, Courts §§ 64, 65.
[14] 49 Am Jur, States, Territories and Dependencies § 33.
   16 Am Jur 2d, Constitutional Law §§ 313–327, 371, 372.
[15, 27] 25 Am Jur 2d, Drugs, Narcotics and Poisons §§ 7–9.
[16] 25 Am Jur 2d, Drugs, Narcotics and Poisons §§ 7, 10, 12.
   20 Am Jur 2d, Courts §§ 64, 65.
[17] 33 Am Jur, Licenses § 52.5.
   25 Am Jur 2d, Drugs, Narcotics and Poisons §§ 7, 10, 12.
[18] 35 Am Jur, Mandamus § 393.
[19] 5 Am Jur 2d, Appeal and Error § 739.
[20] 2 Am Jur 2d, Administrative Law §§ 730, 744.
[21, 22] 50 Am Jur, Statutes §§ 223, 224.
[23] 25 Am Jur 2d, Drugs, Narcotics and Poisons §§ 10, 14, 15.
[24, 25] 34 Am Jur, Mandamus § 70.

*pharmacy board disclose such individual was, continuously during that period, a registered pharmacist, whereby it is inferred that such was the situation throughout the 30-year period including time when statute became effective requiring that 25% of stock of corporate owner of a pharmacy be owned by registered pharmacists (PA 1927, No 359, § 1).*

3. SAME—LICENSE—GRANDFATHER CLAUSE.
   *Denial of renewal of license to corporate applicant because of alleged discontinuance of operations so as to cause it to lose*

---

REFERENCES FOR POINTS IN HEADNOTES
[26]  5 Am Jur 2d, Appeal and Error § 873.
[28]  25 Am Jur 2d, Drugs, Narcotics and Poisons §§ 7–10.
   20 Am Jur 2d, Courts §§ 65, 66.
[29, 30]  49 Am Jur, States, Territories and Dependencies §§ 28, 33, 36.
   16 Am Jur 2d, Constitutional Law §§ 198, 204, 284, 285.
[31]  49 Am Jur, States, Territories and Dependencies §§ 33, 36.
   16 Am Jur 2d, Constitutional Law §§ 204, 284, 285.
[32, 33]  50 Am Jur, Statutes § 471.
   16 Am Jur 2d, Constitutional Law §§ 307, 308.
[34]  16 Am Jur 2d, Constitutional Law §§ 259, 263, 277, 284, 289, 290.
[35]  16 Am Jur 2d, Constitutional Law §§ 311, 313–318.
[36]  16 Am Jur 2d, Constitutional Law §§ 277–280, 307, 308.
[37]  25 Am Jur 2d, Drugs, Narcotics and Poisons §§ 7, 10, 12.
[38]  18 Am Jur 2d, Corporations §§ 46, 208, 209.
[39, 42]  18 Am Jur 2d, Corporations §§ 460, 463, 481, 484, 490.
[40]  25 Am Jur 2d, Drugs, Narcotics and Poisons § 12.
[41]  25 Am Jur 2d, Drugs, Narcotics and Poisons §§ 7–9, 12.
[43]  20 Am Jur, Evidence §§ 783–786.
[44]  16 Am Jur 2d, Constitutional Law §§ 485, 488–493.
[45]  16 Am Jur 2d, Constitutional Law §§ 494, 498–505.
[46]  33 Am Jur, Licenses § 52.5.
   16 Am Jur 2d, Constitutional Law §§ 517–519.
[48]  2 Am Jur 2d, Administrative Law § 768; 35 Am Jur, Mandamus § 394.
[49]  34 Am Jur, Mandamus §§ 184, 386, 390.
[50]  2 Am Jur 2d, Administrative Law §§ 553–555, 610, 612, 645.
[51]  2 Am Jur 2d, Administrative Law §§ 767, 768.
[52]  33 Am Jur, Licenses § 67.
[53]  2 Am Jur 2d, Administrative Law §§ 645, 654, 676, 764–766.
[54]  2 Am Jur 2d, Administrative Law §§ 697, 755, 756, 759.
[55]  2 Am Jur 2d, Administrative Law §§ 553–555, 610, 612–614.
[56–58]  20 Am Jur 2d, Courts § 201.
[59]  25 Am Jur 2d, Drugs, Narcotics and Poisons §§ 7, 12.
[60]  25 Am Jur 2d, Drugs, Narcotics and Poisons §§ 7, 8, 10.
[61]  50 Am Jur, Statutes § 223.
[62]  25 Am Jur 2d, Drugs, Narcotics and Poisons §§ 7–15.
[63]  16 Am Jur 2d, Constitutional Law §§ 313–318.
[64, 66–68]  25 Am Jur 2d, Drugs, Narcotics and Poisons §§ 7, 12.
[65]  20 Am Jur, Evidence §§ 16, 18, 65, 89, 110, 120.

*status under so-called grandfather clause of pharmacy licensing act and for violation of such act* held, *not well founded (PA 1927, No 359, § 1).*

4. Appeal and Error—Questions Reviewable—Druggists—Statutes—Grandfather Clause—Pledge of Corporate Licensee's Capital Stock.
  *Claim of defendant pharmacy board that pledge of capital stock of corporate licensee under pharmacy act, as security for indebtedness and loans, caused such licensee to lose such rights it may have had under so-called grandfather clause is not discussed, where raised for the first time on second appeal (PA 1927, No 359, § 1).*

5. Druggists—Construction of Statutes—Grandfather Clause.
  *Defendant pharmacy board's contention that the language of the statute controlling ownership of pharmacies creating the so-called grandfather rights means that any corporation which, at time of passage of the act, did not meet the requirement of ownership of at least 25% of its stock by registered pharmacists but was then owning and conducting a drugstore would be permitted to continue to do so* held, *correct (PA 1927, No 359, § 1).*

6. Same—Pharmacies—Grandfather Clause—Statutory Construction.
  *Plaintiff's contention that the so-called grandfather clause of the statute regulating ownership of pharmacies means that any corporation, regardless of who held its stock at the time, which owned and conducted a drugstore at the time of passage of the act might continue to do so thereafter, even if, in the future, there was no ownership of at least 25% of its stock by registered pharmacists* held, *incorrect (PA 1927, No 359, § 1).*

7. Statutes—Trade or Profession—Statutory Regulations—Grandfather Clause.
  *The purpose of an exception or grandfather clause in a statute is to exempt from the statutory regulations imposed for the first time on a trade or profession those members thereof who are then engaged in the newly regulated field.*

8. Druggists—Act Regulating Pharmacies—Intent and Purpose.
  *The legislative intent and purpose of the statute regulating ownership of pharmacies was to require that at least 25% of the stock of corporations owning and conducting drugstores should be owned by registered pharmacists, but to make an*

*exemption and exception for corporations which, at the time of passage of the act, were not so owned but were owning and conducting drugstores (PA 1927, No 359, § 1).*

9. SAME—PHARMACY BOARD—DENIAL OF LICENSE—GRANDFATHER CLAUSE.

*Defendant pharmacy board's denial of a license to plaintiff corporation* held, *proper, where plaintiff corporation, which qualified under the regulations of the statute when it was passed in 1927 as more than 25% of its stock was owned by a registered pharmacist, was in no need of the beneficent terms of the exemption of grandfather clause, and, accordingly, acquired no rights under it (PA 1927, No 359, § 1).*

10. SAME—PHARMACY BOARD—DENIAL OF LICENSE—STOCKHOLDING OF CORPORATE LICENSE.

*Plaintiff corporation which never had acquired rights under socalled grandfather clause of pharmacy licensing act was properly denied renewal of license, where 25% of its stock was not held by registered pharmacist (PA 1927, No 359, § 1).*

11. SAME—CONSTITUTIONAL LAW—STATUTES—STOCK OWNERSHIP OF CORPORATE LICENSEES.

*Plaintiff's contention that the statute regulating ownership of pharmacies violates its constitutional rights to operate a legitimate private business in that the acts' prohibition bears no reasonable relationship to public health, safety, and morals and creates arbitrary and unnecessary restrictions depriving plaintiff of due process and equal protection of the law,* held, *not well taken, under record containing testimony of eminent pharmacologists, teachers, and practitioners in the field, that in their opinion there is a reasonable relationship between the statutory stock ownership requirements and public health and safety (PA 1927, No 359, § 1).*

12. STATUTES—PRESUMPTIONS.

*The presumption of the constitutionality of a statute favors validity and, if the relation between the statute and the public welfare is debatable, the legislative judgment must be accepted.*

13. CONSTITUTIONAL LAW—COURTS—LEGISLATURE.

*Courts do not substitute their social and economic beliefs for the judgment of legislative bodies.*

14. SAME—LEGISLATION—PROTECTION OF PUBLIC—ARBITRARY AND UNREASONABLE RESTRICTIONS.

*A State cannot, under the guise of protecting the public, arbitrarily interfere with private business or prohibit lawful occu-*

*pations or impose unreasonable and unnecessary restrictions upon them.*

15. DRUGGISTS—SALE OF DRUGS AND POISONS—PUBLIC HEALTH.
   *The sale of drugs and poisons can very directly affect public health, safety, and the general welfare.*

16. SAME—STATUTES—STOCK OWNERSHIP—DRUGS—PUBLIC HEALTH.
   *The legislative judgment, when supported by testimony of professional men in the field, that the character of ownership of stock in corporations engaging in the sale of drugs and poisons can have an effect on public health, debatable though it may be, is not a subject for judicial redetermination (PA 1927, No 359, § 1).*

17. SAME—CONSTITUTIONAL LAW—STOCK OWNERSHIP OF CORPORATE OWNER OF PHARMACY.
   *Statute requiring that 25% of stock of corporate owner of pharmacy be owned by registered pharmacists in order to obtain a license to own and conduct a pharmacy held, constitutional, as against contentions of corporation, which had acquired no rights under so-called grandfather clause, that such requirement was an arbitrary interference with a private business and an unreasonable and unnecessary restriction upon a lawful occupation (PA 1927, No 359 § 1).*

18. COSTS—MANDAMUS—PHARMACY LICENSE—CORPORATIONS.
   *No costs are allowed in mandamus proceeding to compel State pharmacy board to issue license to plaintiff corporation (PA 1927, No 359, § 1).*

SEPARATE OPINION.

KELLY, SMITH, AND O'HARA, JJ.

19. APPEAL AND ERROR—APPELLATE COURTS—JUDICIAL NOTICE—PLEADINGS.
   *Appellate courts on review may not resort to judicial notice of facts to raise issues not presented by the pleadings.*

20. SAME—SPECIAL STATUTORY PROCEDURE—PHARMACY BOARD—PLEADINGS—PROCEEDINGS.
   *The pleadings in an appellate review of a special statutory procedure, a hearing before the State board of pharmacy, are in fact the proceedings below, and they circumscribe the controversy as definitively as if they had been titled "complaint" or "answer."*

21. STATUTES—CONSTRUCTION—LEGISLATIVE INTENT.
     *Legislative intent is found by statutory construction.*

22. SAME—CONSTRUCTION—INTENT.
     *The cardinal rule of statutory construction is to ascertain and*
     *give effect to the intention of the legislature and the intent*
     *of an unambiguous statute must be determined accordingly.*

23. DRUGGISTS—LICENSES—CORPORATIONS—GRANDFATHER   CLAUSE—
     STATUTES.
     *Plaintiff corporation in mandamus proceeding held, entitled to*
     *proper license for operation of its pharmacy and drugstore*
     *in city where record shows it and its predecessors had operated*
     *such an establishment from 1927, denial of renewal of license*
     *for noncompliance with pertinent statutes not having been well*
     *founded (CL 1948, § 338.481).*

24. MANDAMUS—MINISTERIAL ACT.
     *Mandamus lies to compel the performance of a ministerial act by*
     *a board or commission where nothing remains to be done ex-*
     *cept to perform that act which the board or commission refuses*
     *to perform.*

25. SAME—MINISTERIAL DUTY.
     *The writ of mandamus lies to enforce performance of a clear*
     *legal right or ministerial duty.*

26. APPEAL AND ERROR—MANDAMUS—QUESTIONS REVIEWABLE—CON-
     STITUTIONAL LAW—CORPORATE OWNERSHIP OF PHARMACIES.
     *Whether statute regulating ownership of pharmacies was constitu-*
     *tional and requiring ownership of 25% of stock of corporate*
     *owners by registered pharmacists is constitutional is not deter-*
     *mined on appeal in mandamus action against State licensing*
     *agency, where such question is not reached in determination*
     *made (CL 1948, § 338.481).*

SEPARATE OPINION.

SOURIS and ADAMS, JJ.

27. DRUGGISTS—SALE OF DRUGS AND POISONS—PUBLIC HEALTH—
     REGULATION.
     *Any reasonable exercise of the police power in the field of regu-*
     *lating the sale of drugs and poisons directly affecting the*
     *public health, safety, and general welfare must be upheld on*
     *appeal.*

28. SAME—SALE OF DRUGS AND POISONS—REGULATION.

*The validity of legislative regulation of the sale of drugs and poisons is tested by the rationality of the method of regulation employed by the legislature.*

29. CONSTITUTIONAL LAW—STATES—POLICE POWER—COMMERCIAL AND BUSINESS AFFAIRS.

*States have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific Federal constitutional prohibitions, or of some valid Federal law.*

30. SAME—STATES—STATUTES—NEW TECHNIQUES.

*States have constitutional authority to experiment with new techniques and they are entitled to their own standards of the public welfare in the exercise of their legislative power.*

31. SAME—STATES—REGULATION—BUSINESS.

*States may within extremely broad limits control practices in the business-labor field, so long as specific constitutional prohibitions are not violated and so long as conflicts with valid and controlling Federal laws are avoided.*

32. SAME—REGULATION—PUBLIC HEALTH—RATIONALITY.

*A State regulation affecting the public health and welfare should be supported on appeal if the court finds that there is an evil for correction, and that it might be thought the legislative measure was a rational way to correct it.*

33. SAME—PUBLIC WELFARE—RATIONALITY.

*State legislation, once the appellate court is satisfied that the public welfare is involved, is upheld if it reasonably and rationally either forbade an evil or regulated a business or profession.*

34. SAME—POLICE POWER—REGULATION—PROHIBITION OF TRADE— USEFUL AND HARMLESS ARTICLES OF COMMERCE.

*The State police power of regulation does not include the absolute prohibition of trade in useful and harmless articles of commerce.*

35. SAME—RIGHT TO ENGAGE IN BUSINESS—HARM TO PUBLIC.

*The Constitution guarantees to citizens the general right to engage in any business which does not harm the public.*

36. SAME—POLICE POWER—REASONABLE RELATION BETWEEN REMEDY AND PUBLIC PURPOSE.

*Exercise of the police power must be to promote the public welfare or to correct a public wrong, and the relation between the remedy adopted and the public purpose must be a reasonable one.*

37. DRUGGISTS—OWNERSHIP OF PHARMACIES—OWNERSHIP OF CORPORATE STOCK.

*Ownership of pharmacies act which requires that all pharmacies, drugstores, or apothecary shops must be owned by a registered pharmacist, or by a corporation 25% of whose stock is owned by registered pharmacists held, neither reasonable nor rational because there is no necessary or consequential relationship between ownership of 25% of the stock of a corporation and the control, management, and operation of the business and property of the corporation (CL 1948, § 338.481).*

38. CORPORATIONS—STOCK—CAPITAL—MANAGEMENT.

*Stock of a corporation is issued to provide capital, not management.*

39. SAME—STOCKHOLDERS—CONTROL OVER CONDUCT OF CORPORATE BUSINESS.

*A stockholder, as such, has no control over the conduct of a corporate business, nor is he required or permitted to engage in the activities of a corporation by virtue of stock ownership.*

40. DRUGGISTS—OWNERSHIP OF PHARMACY—RELATION TO PUBLIC HEALTH.

*Mere stock ownership in a corporation, owning and operating a drugstore, can have no real or substantial relation to the public health.*

41. SAME—PROTECTION TO PUBLIC—INDIVIDUAL PHARMACIST.

*The basic protection to the public in the practice of pharmacy is through the individual pharmacist.*

42. CORPORATIONS—STOCK OWNERSHIP—MANAGEMENT CONTROL.

*A 25% stock ownership in a corporation does not, in this State, give any significant management control.*

43. WITNESSES—PHARMACY—CORPORATIONS—EXPERTS.

*Witnesses who testified that legislation which required that registered pharmacists hold 25% of the stock of a corporation owning a drugstore has a reasonable relationship to public welfare held, to have failed to qualify as experts on validity*

*of legislation, where their testimony reveals that while they hold extensive backgrounds in pharmacy, they readily confessed their ignorance of stock ownership and of corporate control, structure, or management (CL 1948, § 338.481).*

44. Constitutional Law—Equal Protection—State Action.

*The equality clause is not limited only to the protection of rights granted by the Federal Constitution or otherwise protected by it, but extends to all rights whether granted by Federal or State Constitutions, statutes, or executive orders, and against all forms of State action, executive, legislative, or judicial (US Const, Am 14).*

45. Statutes—Classification—Reasonable Relation to Object of Legislation.

*Classification is permissible in the application of a statute or ordinance, but the classification must be based on natural distinguishing characteristics and must bear a reasonable relation to the object of the legislation, and operate equally upon all within a class.*

46. Same—Grandfather Clause—Invalid Classification.

*The so-called grandfather clause in the statute purporting to regulate the ownership of pharmacies, which exempts from the operation of the statute corporations in existence at the time the act became effective, held, an unfair and discriminatory classification and devoid of equal protection of the laws, especially in view of the fact that domestic corporations are free to perpetuate themselves in perpetuity (US Const, Am 14; Mich Const 1963, art 1, § 2; CL 1948, § 338.481; PA 1963 [2d Ex Sess], No 26).*

Dissenting Opinion.

T. M. Kavanagh, C. J., and Black, J.

47. Administrative Law and Procedure—Pharmacies—Board of Pharmacy.

*The administrative functions of the pharmacy act are vested exclusively with the State board of pharmacy (PA 1885, No 134 as amended, and PA 1962, No 151, as amended by PA 1965, No 162).*

48. Appeal and Error—Mandamus—Board of Pharmacy.

*Review by the Supreme Court of determination by the State board of pharmacy held, a specially authorized "appeal" rather than original mandamus, where board had been directed to review its denial of license with granted right of appeal.*

49. Mandamus—Discretion of Officers—Board of Pharmacy—Licenses.

*A writ of mandamus to compel grant of pharmacy license, if issued and served, will brook no discretion of the State board of pharmacy to consider or reconsider administratively ascertained violations of the pharmacy laws by plaintiff corporation, will determine that previous findings of the board are a nullity the board may no longer employ against plaintiff, and will thus provide for plaintiff an overt advantage over other licensees and future applicants.*

50. Administrative Law and Procedure—Function of Reviewing Court.

*The function of a reviewing court in an appeal from a decision by an administrative agency is to determine errors of law, and then to return the matter to the agency for reconsideration.*

51. Same—Correction of Errors—Legislative Policy.

*An administrative determination in which is embedded a legal question open to judicial review does not impliedly foreclose the administrative agency, after its error has been corrected, from enforcing the legislative policy committed to its charge.*

52. Same—Courts—Licenses.

*A court reviewing an administrative decision granting or denying a license or permit is limited to ascertaining the presence or observation of assigned errors of law and the correction of such errors, and when same are discovered, the courts are not authorized to grant, deny, or revoke licenses and permits, directly or by the indirection of peremptory writs.*

53. Same—Courts—Correction of Errors.

*In administrative cases the reviewing courts review and correct legal errors and leave the rest of the administrative process to the statutorily appointed administrator or administrators, subject always to further review as permitted by law.*

54. Appeal and Error—Administrative Agency.

*Finding by defendant State board of pharmacy that plaintiff corporation was not entitled to "grandfather rights" under the statute pertaining to the ownership of pharmacies held, supported by the record (CL 1948, § 338.481).*

55. ADMINISTRATIVE LAW AND PROCEDURE—CONSTRUCTION OF STATUTE —COURTS.

> *A court's review of a construction of a statute by an administrative agency is limited and all that is needed to support the agency's interpretation is that it have "warrant in the record" and a "reasonable basis in law."*

56. COURTS—PRECEDENTS.

> *A judge of a subordinate court is not to pick and choose between various precedents when a court to which he owes obedience has definitely determined the question he must decide, in the exact substance of fact which confronts him, and has not overruled that determination.*

57. SAME—PRECEDENTS.

> *A judge of a subordinate court is constitutionally disabled from predicting, and from proceeding upon strength of such a prediction, that his superior will overrule or ignore established precedent, as obedience, not forecast, is the order of the day of a judge of a subordinate court.*

58. APPEAL AND ERROR—OVERRULEMENT.

> *Reversal by overrulement spells honor rather than dishonor of the judge who stands upon law as it is written rather than his estimate of what the law might become on review.*

59. DRUGGISTS — STATUTES — REGULATION OF OWNERSHIP OF PHARMACIES.

> *Sole legislative purpose of statute pertaining to pharmacies held, to be regulation of the ownership of pharmacies, drugstores, and apothecary shops (CL 1948, § 338.481).*

60. SAME—STATUTES—REGULATION OF PRACTICE OF PHARMACY.

> *Comprehensive regulation of the practice of pharmacy held, to be the design of acts safeguarding the public health in such field (PA 1885, No 134, as amended, and PA 1962, No 151, as amended).*

61. STATUTES—CONSTRUCTION.

> *Statutes should be construed by attempting to ascertain what the legislative body meant at the time of adopting the act.*

62. DRUGGISTS—CONSTRUCTION OF STATUTES—OWNERSHIP—PRACTICE OF PHARMACY.

> *The conclusion that the ownership of pharmacies poses no "real and substantial relation" to the public health is supported by the fact that it would seem that every point at which*

*the public health is likely to be wrongly affected by the act of the owner in buying, compounding, or selling drugs, and medicine is amply safeguarded by other statutes regulating the practice of pharmacy (PA 1885, No 134, as amended; PA 1927, No 359; PA 1962, No 151, as amended).*

63. Constitutional Law—Interference With Business or Occupations.

*A State cannot, under the guise of protecting the public, arbitrarily interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them.*

64. Druggists—Ownership of Drugstores—Statutes.

*Statute which regulates ownership of drugstores plainly forbids the exercise of an ordinary property right and, on its face, denies what the Constitution guarantees (US Const, Am 14; PA 1927, No 359).*

65. Evidence—Judicial Notice—Corporately Owned Drugstores—Ownership of Stock.

*The court takes judicial notice of the fact that the stock in corporations owning and operating drugstores is bought and sold upon the various stock exchanges of the country, and, in the nature of things, must be held and owned to a large extent by persons who are not registered pharmacists.*

66. Druggists—Ownership—Public Health.

*The claim that mere ownership of a drugstore by one not a pharmacist bears a reasonable relation to the public health, held, not supported by the record (PA 1927, No 359).*

67. Constitutional Law — Ownership of Pharmacies — Due Process.

*Statute regulating ownership of drugstores, which requires that they be owned by registered pharmacists, or by corporations of whose stock 25% is owned by registered pharmacists, held, unconstitutional in contravention of the due process clause of the Constitution (US Const, Am 14; PA 1927, No 359).*

68. Same—Ownership of Pharmacies—Public Health.

*Statute regulating ownership of drugstores, which requires that they be owned by registered pharmacists, held, to disclose no constitutional relationship to the public health (PA 1927, No 359).*

Original mandamus by Superx Drugs Corporation, a Michigan corporation, against the State Board

of Pharmacy and David M. Moss, director of drugs and drugstores, to compel issuance of license to operate a pharmacy. Orders of reference made to Calhoun circuit for taking of testimony and for finding of facts. Submitted July 17, 1963. (Calendar No. 32, Docket No. 50,087.) Writ granted December 5, 1963, directing defendant board to grant license. See 372 Mich 22. Rehearing denied February 3, 1964. Writ withdrawn February 4, 1964. Rehearing granted *sua sponte* January 13, 1965. Record from Calhoun circuit transmitted to State Board of Pharmacy for board review and report to Supreme Court, by written opinion, within 20 days. Decided May 10, 1965, 375 Mich 314.

Application for license denied by State Board of Pharmacy December 16, 1965. Plaintiff appeals. Submitted June 9, 1966. (Calendar No. 6, Docket No. 51,379.) Writ granted November 11, 1966.

*Stanley E. Beattie, James C. Allen,* and *Richard G. James,* for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Joseph B. Bilitzke,* and *Maurice M. Moule,* Assistant Attorneys General, for defendants.

DETHMERS, J. (*dissenting*). This was original mandamus to compel defendant to grant a license to plaintiff for operation of a drugstore for the year commencing July 1, 1962. The case now makes its third full dress appearance here. On December 5, 1963, by opinion of a majority of this Court, it was ordered that the writ issue. *Superx Drugs Corporation v. State Board of Pharmacy,* 372 Mich 22, 44. After rehearing denied and later granted, this Court remanded the matter to defendant board for hearing

and determination, with jurisdiction retained here for further appellate review if desired by either party. *Superx Drugs Corporation* v. *State Board of Pharmacy,* 375 Mich 314. Reading of the opinions at the above two citations will disclose the facts and issues involved. We are now at the juncture of the review desired by plaintiff of the determination of defendant board, on said remand, denying the license.

The question before this Court still is whether plaintiff is entitled to the license.

Plaintiff was incorporated in 1909, for a term of 30 years. In 1939 it filed articles with the corporation and securities commission extending its corporate life for another 30 years. We take judicial notice of the fact that, as appears from that commission's records, Frank Jones, both in 1909 and 1939, owned more than 25% of the stock, and that the records of defendant board disclose that he was continuously, during that period, a registered pharmacist. It is a fair inference—a valid presumption, not disputed in this case, that such was the situation throughout that 30-year period, including September 5, 1927, when PA 1927, No 359, § 1 (CL 1948, § 338.481 [Stat Ann 1956 Rev § 14.771]), governing the ownership and licensing of pharmacies and drugstores, became effective.

On May 25, 1962, the Kroger Company acquired all of the stock of plaintiff corporation. From then on, concededly, none of plaintiff's stock was held by a registered pharmacist. On or about June 5, 1962, plaintiff filed with defendant board application for the license here in question. Upon its denial this suit was brought.

The above cited section of the governing statute reads as follows:

"Every pharmacy, drug store or apothecary shop shall be owned by a registered pharmacist and no partnership or corporation shall own a drug store, pharmacy or apothecary shop unless at least 25 per cent of all stock is held by registered pharmacists, except that any corporation, organized and existing under the laws of the State of Michigan, or any other State of the United States, authorized to do business in the State of Michigan and empowered by its charter to own and conduct pharmacies, drug stores or apothecary shops and which, at the time of the passage of this act, owns and conducts a drug store or stores, pharmacy or pharmacies, apothecary shop or shops in the State of Michigan may continue to own and conduct the same and may establish and own additional pharmacies, drug stores or apothecary shops in accordance with provisions of this article: Provided, That any such corporation which shall not continue to own at least 1 of the pharmacies, drug stores or apothecary shops theretofore owned by it, or ceases to be actively engaged in the practice of pharmacy in the State of Michigan, shall not be permitted thereafter to own a drug store, pharmacy or apothecary shop: And provided further, That any person not a registered pharmacist who at the time of the passage of this act owns a pharmacy, drug store or apothecary shop in the State of Michigan, may continue to own and conduct the same in accordance with existing laws and regulations: And provided further, That the administrator, executor or trustee of the estate of any deceased owner of a pharmacy, drug store or apothecary shop, or the widow, heirs or next of kin of such deceased owner, may continue to own and conduct such pharmacy, drug store or apothecary shop in accordance with existing laws and regulations: Provided further, That this act shall not apply to stores or shops in which patent or proprietary medicines and ordinary domestic or household remedies, such as the sale of is provided for in section 18 of Act No. 134,

Public Acts of 1885, are the only drugs and medicines sold at retail."

Plaintiff contended before defendant board, as here, that despite the lack of present ownership of any of its stock by a registered pharmacist, it was entitled to a license under the so-called grandfather clause of the above quoted governing statute. This was on the theory that plaintiff corporation, at the time of the passage of the 1927 act, owned and was conducting a drug store and had continued to do so, uninterruptedly, ever since, thus qualifying it for license renewal under that statutory provision.

Defendant's first position was that plaintiff had lost its "grandfather" clause rights because the closing of its store, for remodeling, from August 30, 1958, to November 24, 1958, amounted to its discontinuance of ownership and conducting of a drugstore within the meaning of the quoted language of the statute, thus ending its grandfather clause rights. That contention and the further reason advanced by defendant for denial of license, namely, that plaintiff had engaged in unlawful sales of drugs without prescriptions signed by a physician, this Court disposed of in 372 Mich, *supra,* adversely to defendant's position and, hence, ordered issuance of the writ. With respect to those points we remain of the same view still. We would be no further disposed now to go along with defendant's argument, not raised on the first appeal, that plaintiff's grandfather rights, if it had any, were lost by reason of and during a period when its capital stock was pledged to an insurance company as security for an indebtedness and loans.

On the latest argument before this Court, for the first time, counsel for defendant raised the point that plaintiff was not entitled to anything under the grandfather clause, not because, as previously

contended by it, plaintiff had lost those rights, but because plaintiff had never had grandfather clause rights. Although belatedly raised, we permitted the question to be argued at that late date and to be considered and briefed by both parties in supplemental briefs.

This last above consideration presents a question of statutory construction. Defendant says that the language of the statute creating the so-called grandfather rights means that any corporation which, at time of passage of the act, did not meet the requirement of ownership of at least 25% of its stock by registered pharmacists but was then owning and conducting a drugstore would be permitted to continue to do so. Plaintiff says that the language means that any corporation, regardless of who held its stock at the time, which owned and conducted a drugstore at the time of passage of the act might continue to do so thereafter, even if, in the future, there was no ownership of at least 25% of its stock by registered pharmacists. We adopt defendant's version as the correct interpretation.

"The purpose of an exception or grandfather clause is to *exempt* from the statutory regulations imposed for the first time on a trade or profession those members thereof who are then engaged in the newly regulated field." *State, ex rel. Krausmann*, v. *Streeter,* 226 Minn 458, 463 (33 NW2d 56). (Emphasis supplied.)

See 18A Words and Phrases (Perm ed), p 359, General law.

Manifestly, the legislative intent and purpose was to require that at least 25% of the stock of corporations owning and conducting drugstores should be owned by registered pharmacists, but to make an *exemption* and *exception* for corporations which, at the time of passage of the act, were not so owned but were owning and conducting drugstores. A corpo-

ration qualified to act under the statute, at the time of its passage, without benefit of that portion constituting the grandfather clause was in no need of an exemption from the requirements of the statute and, hence, the exemption was meaningless as to it and had no application to it. In the instant case, at the time of the passage of the act, more than 25% of plaintiff's stock was owned by Frank Jones. Hence, passage of the act and enforcement of its requirements and regulations could have had no adverse effect on plaintiff's continued right to own and conduct a drugstore. It was in no need of the beneficent terms of the exemption or grandfather clause and, accordingly, acquired no rights under it. Having acquired no grandfather rights, and 25% or more of its stock not being held by registered pharmacists at the time of the application for the license here in question, plaintiff did not then meet statutory requirements and defendant board was, therefore, correct in denying the application.

It will be noted in Mr. Justice CARR's majority opinion, 372 Mich 22, on pages 59 and 60, that constitutionality of the act was not there passed upon by this Court. Plaintiff asserts that, if construed to require denial of its application for license, the act is violative of plaintiff's constitutional rights to operate a legitimate private business, in that the act's prohibition bears no reasonable relationship to public health, safety, and morals and creates arbitrary and unnecessary restrictions, depriving plaintiff of due process and equal protection of the laws. Plaintiff's reliance in this connection is placed on *Liggett Co.* v. *Baldridge,* 278 US 105 (49 S Ct 57, 73 L ed 204), in which a Pennsylvania statute requiring that stockholders of a pharmacy corporation must be registered pharmacists was held to be constitutionally invalid on the ground that it contravened the due

process and equal protection clauses of the 14th
Amendment of the Constitution of the United States.
This, says plaintiff, was a holding based on the con-
cept of economic due process, with the court saying,
so plaintiff asserts, that the act bore no relationship
to public health. With respect to that precise point,
what the court did say, on page 113, is the following:

"In the light of the various requirements of the
Pennsylvania statutes, it is made clear, if it were
otherwise doubtful, that mere stock ownership in a
corporation, owning and operating a drug store, can
have no real or substantial relation to the public
health. * * * *No facts are presented by the rec-
ord*, and, so far as appears, none were presented to
the legislature which enacted the statute, that prop-
erly could give rise to a different conclusion." (Em-
phasis supplied.)

In the instant case the record is otherwise. There
is testimony of eminent pharmacologists, teachers
and practitioners in the field, that in their opinion
there is a reasonable relationship between the stat-
ute's stock ownership requirements and public health
and safety. They also testified as to their reasons
for their opinions. It is true that there also is testi-
mony in the record to the contrary. As this Court
said, however, in *Grocers Dairy Company* v. *Depart-
ment of Agriculture Director,* 377 Mich 71:

"The presumption of the constitutionality of a
statute favors validity and, if the relation between
the statute and the public welfare is debatable, the
legislative judgment must be accepted."

In the 1963 decision of *Ferguson* v. *Skrupa,* 372
US 726 (83 S Ct 1028, 10 L ed 2d 93, 95 ALR2d 1347),
coming 35 years after *Liggett,* the court said (pp
730, 731):

"We have returned to the original constitutional
proposition that courts do not substitute their social

and economic beliefs for the judgment of legislative
bodies.  *  *  *

"We refuse to sit as a 'superlegislature to weigh
the wisdom of legislation,' and we emphatically re-
fuse to go back to the time when courts used the due
process clause 'to strike down State laws, regulatory
of business and industrial conditions, because they
may be unwise, improvident, or out of harmony with
a particular school of thought.' "

The above was cited with approval in: *Head* v.
*New Mexico Board of Examiners in Optometry,* 374
US 424 (83 S Ct 1759, 10 L ed 2d 983); *England* v.
*Medical Examiners,* 375 US 411 (84 S Ct 461, 11 L
ed 2d 440); *Atlanta Motel* v. *United States,* 379 US
241 (85 S Ct 348, 13 L ed 2d 258); *Meat Cutters
Union* v. *Jewel Tea Co.,* 381 US 676 (85 S Ct 1596,
14 L ed 2d 640).

In *Daniel* v. *Family Security Life Insurance Co.,*
336 US 220 (69 S Ct 550, 93 L ed 632, 10 ALR2d 945),
the court said (pp 224, 225):

"We cannot say that South Carolina is not entitled
to call the funeral insurance business an evil.   Nor
can we say that the statute has no relation to the
elimination of those evils.   There our inquiry must
stop.

"This rationale did not find expression in *Liggett
Co.* v. *Baldridge,* 278 US 105, on which respondents
rely.   According to the majority in *Liggett,* 'a State
cannot, "under the guise of protecting the public,
*arbitrarily* interfere with private business or pro-
hibit lawful occupations or impose *unreasonable* and
unnecessary restrictions upon them." ' "   (Emphasis
supplied.)

We think significant the language of the United
States Supreme Court in *Daniel* to the effect that
there has been "a pronounced shift of emphasis" in
that court since its decision in *Liggett,* with respect
to the meaning of the words "unreasonable" and

"arbitrary" as applied to State statutes regulating the operation of business, to the extent that in *Daniel* a State statute prohibiting life insurance companies from engaging in the undertaking business and undertakers from serving as agents for such companies was upheld as being a reasonable and not an arbitrary exercise of the police power for the protection of the public.

In *People* v. *Carroll,* 274 Mich 451, a statute requiring the owner or operator of a dental parlor to be a regularly licensed dentist was upheld as not unconstitutional. This Court said (p 456):

"It is a well-known fact that in the profession of dentistry the services rendered are personal and call for knowledge in a high degree and that to separate this knowledge from the power of control is an evil, the correction of which was attempted by the instant legislation. The evils which arise from divorcing the 'power of control' from 'knowledge' apply with equal force to a partnership as well as a corporation."

The sale of drugs and poisons can very directly affect public health, safety and the general welfare. The legislative judgment, when supported, as in this case, by testimony of professional men in this field, that the character of ownership of stock in corporations engaging in such sales can have an effect on public health, debatable though that may be, is not a subject for judicial redetermination. *Grocers Dairy Company* v. *Department of Agriculture Director, supra.*

We hold that the act is constitutional, that plaintiff acquired no rights under its grandfather clause, and that the defendant board was, therefore, right in denying the license.

Writ should be denied. No costs.

O'Hara, J. The background and facts in this case are sufficiently set forth in Mr. Justice Dethmers'

opinion. I accept them as I do his statement of the issue:

"The question before this Court still is whether plaintiff is entitled to the license."

I disagree with his conclusion and respectfully dissent therefrom. In order to understand my position it is essential to set out in full the determination of the defendant board:

"1. Therefore it is the determination of the board that based upon the facts, as determined from the full record, the Owl Drug Co., the predecessor of the applicant, did not *actively engage in the practice of pharmacy* from January, 1958, even though the corporate structure was there. Thus the applicant has not fulfilled the requirements of the statute so as to be eligible for a license under the provisions of PA 1927, No 359.

"2. The board wishes to point out that this decision is based upon its determination of the facts and the law. The board further notes that the order of the Supreme Court of May 10, 1965 provides that each party shall have 20 days to appeal the decision of the board to the Supreme Court. The board assumes and hopes that the applicant will exercise this right of appeal so that the highest court of this State may determine the validity of the board's decision."

The foregoing "determination" is based upon the board's conclusions of law, and those conclusions, of necessity, are a part of the "determination." The critical conclusions are therefore set out:

"CONCLUSIONS OF LAW REGARDING FOREGOING FACTS:
"* * *

"II. Considering now: Is the applicant entitled to exercise the rights of a 'grandfather' as provided in PA 1927, No 359?

"1. That M. L. Briggs, the former sole stock owner of Owl Drug Company (predecessor of Superx Drugs

Corporation), escrowed his stock to the Wolverine
Insurance Company on December 12, 1957, as secu-
rity for funds placed in escrow by Wolverine to pay
the debts of Owl Drug Company.

"2. That subsequently, as a result of Briggs' in-
ability to pay, Wolverine became the owner of the
stock on January 2, 1958. That thereupon, under the
terms of the escrow agreement of December 12, 1957,
Briggs became the manager of the Owl Drug store
in the employ of Wolverine Insurance Company at
a salary of $100 weekly. That the escrow agreement
was signed by Briggs and was between Briggs and
Wolverine Insurance Company, and not the Owl
Drug Company.

"3. That Wolverine Insurance Company continued
to operate the Owl Drug store as the owner thereof
until its sale of the stock on November 6, 1958, to
Herbert Herman. That during the interim period
there had been no reorganization of officers or board
of directors.

"4. That during the above period prior to the sale
to Herman, Wolverine as a part of its operation of
the drug store paid all bills in connection therewith.
Exhibit P. 1, item 6, introduced as part of the record
before Judge Coleman states, First party (Briggs)
agrees upon sale of stock to second party (Wol-
verine Insurance Co.) to resign in writing as an of-
ficer of Owl Drug and will secure resignations of all
officers and directors.

"5. Wolverine Insurance Company applied for
renewal of license in June of 1958 using Briggs'
name as president, when in reality he was only an
employee having no corporate power, was a decep-
tion of the true identity and fact.

"Further, a like situation did exist from 1958
through 1962 when the store was in Mr. Herbert Her-
man's name, d/b/a Herman Pharmacy, licensed as
such and not that of the corporation. All business
as far as the public was concerned, was conducted
under his name. The prescription labels, store signs
and advertising were in Herman's name and not that

of the Owl Drug Company (Exhibits 11, 16, D-2, appendix 225a and others).

"CONCLUSIONS OF LAW, REGARDING GRANDFATHER STATUS:

"1. Application for license renewal in June of 1958 signed by Briggs as president of Owl Drug Company was in violation of section 19 of PA 1949, No 163 [which] stated 'If any registered pharmacist  *  *  * shall have obtained a license by misrepresentation, error, or fraud  *  *  *  the State board of pharmacy shall have the power to revoke or suspend such *license* or *certificate* after giving any such person reasonable notice and an opportunity to be heard.' (Noting that a pharmacy is licensed and a pharmacist is certificated or registered.)

"2. PA 1927, No 359 (ownership of drug stores act), provides that every pharmacy shall be owned by a registered pharmacist and no partnership or corporation shall own a drug store, pharmacy or apothecary shop unless at least 25 per cent of all stock is held by registered pharmacist; provided, however, that drug stores or pharmacies which were owned and conducted at the time of the passage of the act (1927) may continue to own and conduct the same and establish and own additional pharmacies; provided, that any such corporation which shall not continue to own at least one of the pharmacies, drug stores or apothecary shops theretofore owned by it, or *ceases to be actively engaged in the practice of pharmacy,* shall not be permitted thereafter to own a drug store.

"The Owl Drug Company, during the period of the operation of the drug store by Wolverine from January of 1958 to November of 1958, ceased to be actively engaged in the practice of pharmacy within the meaning of this act. *That Wolverine Insurance Company improperly controlled and operated the drug store without a license by use of subterfuge*[1]

---

[1] Emphasis supplied.

(also noting that Wolverine was acting beyond the scope of its corporate charter).

"3. Herbert Herman, d/b/a Herman Pharmacy, licensed as such by the board and alluding to the public that the store was the Herman Pharmacy, further demonstrates that the Owl Drug Company was not actively engaged in the practice of pharmacy during this time. (Also noting that a corporation, by law cannot do business under an assumed name other than its corporate name.)"

It is beyond dispute that the board did not find or hold that plaintiff corporation did not acquire "grandfather" rights because such rights did not vest in plaintiff's predecessor. Contrariwise, it held unequivocally that they did. This for the reason that the board found those rights which accrued on the effective date of the statute in 1927 were lost during the period when the predecessor corporation, the Owl Drug Co., had escrowed its stock to the Wolverine Insurance Company, and thus that the "grandfather" sequence was broken. The board then critically and crucially holds in its "determination":

"3. If, upon appeal, the Supreme Court should determine that the decision of the board was incorrect, and that the Owl Drug Co. and the applicant *have continued to be actively engaged in the practice of pharmacy* so as to come within the provisions of PA 1927, No 359 *then there is nothing further of this record to deny applicant a license.*" (Emphasis supplied.)

However, Mr. Justice DETHMERS holds:

"We would be no further disposed now to go along with defendant's argument, not raised on the first appeal, *that plaintiff's grandfather rights, if it had any, were lost by reason of and during a period when its capital stock was pledged to an insurance company as security for an indebtedness and loans.*" (Emphasis supplied.)

Thus, under his opinion, Mr. Justice DETHMERS
reverses the board on the only basis upon which it
withheld a license, and this in face of the somewhat
unusual statement that absent such a finding being
affirmed "there is nothing further of this record to
deny applicant a license."

Thus, to concur with my esteemed colleague I
would perforce have to make an initial finding of fact
in this Court that no "grandfather" rights accrued.
The vigorous dissents in the prior opinions were
directed only to the *method of review* of the fact-
finding process. It would seem the dissenters would
hardly be any less vigorous if this Court on review
were to make its own original findings of fact. But
the distinguished senior Associate Justice says, as
I understand him, that he does this on the basis of
taking judicial notice of certain public records. He
then comes to certain legal conclusions therefrom.

Again, I must respectfully disagree. In the first
place, it is well settled that appellate courts on re-
view cannot take judicial notice in order to raise
issues not presented by the pleadings:

"Resort cannot be had to judicial knowledge to
raise controversies not presented by the pleadings."
(*Mountain View Mining & Milling Co.* v. *McFadden*,
180 US 533 [syllabus] [21 S Ct 488, 45 L ed 656].)

I suppose it might be said that in this special stat-
utory procedure that before the decision of the board
there were no "pleadings" as such in a literal sense.
But surely for the application of a settled legal prin-
ciple no such narrow interpretation should be made.
The "pleadings" are in fact the proceedings below
and they circumscribed the controversy as defini-
tively as if they had been titled "complaint" or "an-
swer". Either the principle for which *McFadden*
stands is settled and sound or it isn't. I think it is.
To reject it in this case would be to revolutionize the

appellate process to such a degree as to change its essential character.

But let us assume *arguendo* that there is some reason which I do not perceive that in this case this principle should not be applied, what then of the interpretation of the statute contended for by Justice Dethmers? Is it sound? Put in the traditional phraseology, does it under well-established principles reflect that all important "legislative intent"?

Legislative intent, our cases tell us, is found by statutory construction. But before courts are free to construe statutes, they must find some reason for so doing:

"The cardinal rule of statutory construction is to ascertain and give effect to the intention of the legislature. If the language of a statutory provision is unambiguous, the intent must be determined accordingly."[2]

Further citations in support of this principle are unnecessary. None to the contrary, to my knowledge, exists. The relevant section of the statute,[3] after stating the conditions under which corporations can, after the effective date of the act, own and operate drugstores and pharmacies, provides:

"except that *any* corporation, organized and existing under the laws of the State of Michigan, or any other State of the United States, authorized to do business in the State of Michigan and empowered by its charter to own and conduct pharmacies, drug stores or apothecary shops and which, at the time of the passage of this act, owns and conducts a drug store or stores, pharmacy or pharmacies, apothecary shop or shops in the State of Michigan may continue to own and conduct the same and may establish and own additional pharmacies, drug stores or apoth-

---

[2] *Melia* v. *Employment Security Comm.*, 346 Mich 544, at p 562.
[3] CL 1948, § 338.481 (Stat Ann 1956 Rev § 14.771).

ecary shops in accordance with provisions of this article." (Emphasis supplied.)

This exception, my confrere says, really does not mean *"any"* corporation as it plainly reads, but it means only any corporation which prior to the enactment of the statute was not in compliance with its stock ownership requirements. I cannot agree. In the first place, the statute doesn't say so. In the second place, there is no basis in reason for reading the additional language into it.

Contrariwise, to me, reason and logic inveigh against this judicial addition to the plain language of the statute. Many harsh examples of what this interpretation would and could do in individual cases to licensees who for years have operated upon the interpretation always heretofore accorded to the statute that "any corporation" means "any corporation" could be cited. However, the most all-embracing and clearest is that so to hold would bring about the following bizarre result. It would actually discriminate against the corporate licensee who was in compliance with the 25% ownership provision by a registered pharmacist prior to the effective date of the act. If such licensee was in compliance, and thus under the oral argument-advanced theory of the solicitor general (but not so found by the board) acquired no "grandfather" rights, such corporate licensee's capital stock could only be acquired by another corporation which meets the 25% prior ownership test. His noncomplying counterpart corporation on the effective date of the act however can sell to the world. It's one thing to read into a statute additional and necessary wording to avoid an absurd result. I'm not aware, however, of any principle of statutory construction that approves reading language into a statute to bring one about.

In view of the somewhat equivocal and, to a degree, anomalous findings of the board, I am hard put to know whether I am writing to affirm or reverse. However, all writing Justices in this case in any of its trips to our Bench seem in agreement that the issue presented is whether plaintiff appellant is entitled to the issuance of a license.

Within the well-established limitations on judicial review of fact-finding by boards and commissions I can find nothing to do but reverse the defendant board and order the issuance of a license. The only legal conclusion made by the board to support the denial of a license is specifically repudiated by Justice DETHMERS in his opinion. It was specifically repudiated by the majority in the prior opinion.

Mr. Justice BLACK in his strong dissent, after the first hearing before us, stated the principle involved:[4]

"The questions to be heard and decided on remand are those of specific application of statutory terms, to presented facts, *which the appointed agency of administration must determine initially.*" (Emphasis supplied.)

Under the board's decision, the facts found and the statute applied, save for the twice repudiated break-in-sequence theory leave us no alternative. The effect of the board's finding and determination is to say appellant is entitled to a license. The board will not and did not issue it. In this situation a court has nothing to do but direct the issuance of the license by the proper writ. *This is not to review the findings of fact of a board or commission by mandamus. This is not to compel a legislatively created and duty-*

---

[4] *Superx Drugs Corporation* v. *State Board of Pharmacy,* 372 Mich 22, at pp 42, 43.

*entrusted board to act in a certain way.* My decision here rests solely and completely upon the long settled principle that where nothing remains to be done by a board or a commission, except to perform a ministerial act which that board or commission will not perform, mandamus lies to compel its performance. Said another way:

"Mandamus lies only to enforce strict legal rights." *People, ex rel. Houghton County,* v. *Auditor General,* 36 Mich 271, at p 273).

In the case at bar the board tells us:

"If, upon appeal, the Supreme Court should determine * * * that the Owl Drug Co. and the applicant have continued to be actively engaged in the practice of pharmacy * * * then there is nothing further of this record to deny applicant a license."

The Supreme Court has already determined that in legal consequence, the hypothecation of stock and the escrow agreement with regard thereto did not constitute a break in continuity of corporate succession, and that hence there was no failure to engage continuously in the practice of pharmacy.

Mr. Justice DETHMERS in his opinion reaffirms this:

"We would be no further disposed now to go along with defendant's argument, not raised on the first appeal, that plaintiff's grandfather rights, if it had any, were lost by reason of and during a period when its capital stock was pledged to an insurance company as security for an indebtedness and loans." (Quoted *supra.*)

I cannot but conclude that under the findings of fact and the law of the case appellant is entitled to a license.

In view of the reasons herein assigned, I do not reach the question of the constitutionality of the in-

volved statute, and for this reason I do not pass thereon.

Let the writ of mandamus issue.

KELLY and SMITH, JJ., concurred with O'HARA, J.

ADAMS, J. (concurring in issuance of writ). Whether one agrees with the construction of the so-called grandfather provision of CL 1948, § 338.481 (Stat Ann 1956 Rev § 14.771) contended for by Justice DETHMERS or by Justice O'HARA, the statute, in my opinion, is unconstitutional.

## I.

I agree with Justice DETHMERS that the sale of drugs and poisons can very directly affect public health, safety and general welfare. Any reasonable exercise of the police power in this field must be upheld but the test of rationality still applies to the method of regulation employed by the legislature.

I am not unmindful of the strictures of the United States Supreme Court in *Ferguson* v. *Skrupa* (1963), 372 US 726 (83 S Ct 1028, 10 L ed 2d 93, 95 ALR2d 1347), against courts substituting their social and economic beliefs for the judgment of legislative bodies. However, I do not read that case or any of the cases leading up to it as permitting the type of so-called regulation of business practices which the legislature has here attempted.

In *Ferguson* the United States Supreme Court upheld State legislation which prohibited any person other than an attorney from "debt adjusting." This was a *direct* regulation of "debt adjusting" similar to a regulation of the drug business by prohibiting the practice of pharmacy except by registered pharmacists, or similar to the situation in *Head* v. *New Mexico Board of Examiners in Optometry* (1963),

374 US 424 (83 S Ct 1759, 10 L ed 2d 983), where State regulation forbade price-advertising by optometrists, or like the case of *Olsen* v. *Nebraska, ex rel. Western Reference & Bond Association, Inc.* (1941), 313 US 236 (61 S Ct 862, 85 L ed 1305, 133 ALR 1500), which upheld a Nebraska statute requiring the licensing of private employment agencies and limiting maximum compensation for services.

In *Daniel* v. *Family Security Life Insurance Co.* (1949), 336 US 220 (69 S Ct 550, 93 L ed 632, 10 ALR2d 945), a South Carolina statute forbade life insurance companies and their agents to engage in the undertaking business and forbade undertakers to serve as agents for life insurance companies. Here again, the prohibition was a direct one and it was held that the statute did not contravene the due process or equal protection clauses of the Fourteenth Amendment.

In the case of *Lincoln Federal Labor Union* v. *Northwestern Iron & Metal Co.* (1949), 335 US 525 (69 S Ct 251, 93 L ed 212, 6 ALR2d 473), which involved a Nebraska constitutional amendment and a North Carolina statute providing in effect that no person should be denied an opportunity to obtain or retain employment because he was or was not a member of a labor organization, Justice Black wrote (p 536):

"This Court beginning at least as early as 1934, when the *Nebbia* case [*Nebbia* v. *New York*, 291 US 502 (54 S Ct 505, 78 L ed 940, 89 ALR 1469)] was decided, has steadily rejected the due process philosophy enunciated in the *Adair-Coppage* line of cases [*Adair* v. *United States*, 208 US 161 (28 S Ct 277, 52 L ed 436); *Coppage* v. *Kansas*, 236 US 1 (35 S Ct 240, 59 L ed 441, LRA1915C 960)]. In doing so it has consciously returned closer and closer to the earlier constitutional principle that States have power to legislate against what are found to be *in-*

*jurious practices* in their internal commercial and business affairs, *so long as their laws do not run afoul of some specific Federal constitutional prohibition, or of some valid Federal law."* (Emphasis supplied; bracket citations added.)

*Day-Brite Lighting, Inc.,* v. *Missouri* (1952), 342 US 421 (72 S Ct 405, 96 L ed 469), upheld a Missouri statute which provided that an employee entitled to vote might absent himself from his employment for four hours between the opening and closing of the polls on election day, and that any employer who deducted wages for that absence would be guilty of a misdemeanor. In discussing legislative power in that case, the Court through Mr. Justice Douglas said (p 423):

*"The legislative power has limits,* as *Tot* v. *United States,* 319 US 463 (63 S Ct 1241, 87 L ed 1519), holds. But the State legislatures have constitutional authority to experiment with new techniques; they are entitled to their own standard of the public welfare; *they may within extremely broad limits control practices in the business-labor field, so long as specific constitutional prohibitions are not violated and so long as conflicts with valid and controlling Federal laws are avoided."* (Emphasis supplied.)

In the case of *Williamson* v. *Lee Optical of Oklahoma, Inc.* (1955), 348 US 483 (75 S Ct 461, 99 L ed 563), where a State statute making it unlawful for an optician to fit or duplicate lenses without a prescription from an ophthalmologist or optometrist was upheld, the Court said (p 488):

"It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."

In all these cases, once the United States Supreme Court was satisfied that the public welfare was in-

volved, it upheld the regulation which in each case reasonably and rationally either forbade an evil or regulated a business or profession.

The requirement of rationality was reiterated by Mr. Justice Harlan in his concurrence in *Ferguson* wherein he agreed with the judgment "on the ground that this State measure bears a rational relation to a constitutionally permissible objective." (p 733)

Turning to Michigan cases, the same principle of rationality has been stated by this Court. *Carolene Products Co.* v. *Thomson* (1936), 276 Mich 172, involved a statute which attempted to forbid the sale of milk to which had been added any fat or oil other than milk fat. The statute was declared unconstitutional under the due process clause of the Fourteenth Amendment and under article 2, § 16, of the Michigan Constitution of 1908. In his opinion, Justice FEAD said (p 178):

"But the police power of regulation does not include the absolute prohibition of trade in useful and harmless articles of commerce.    *    *    *

"The principles involved are well settled and do not need extensive citation of authorities. The Constitution guarantees to citizens the general right to engage in any business which does not harm the public. *People, ex rel. Valentine,* v. *Berrien Circuit Judge,* 124 Mich 664 (50 LRA 493, 83 Am St Rep 352). The constitutional right to engage in business is subject to the sovereign police power of the State to preserve public health, safety, morals or general welfare and prevent fraud. *In the exercise of the police power there must be not only a public welfare to be conserved or public wrong to be corrected, but there must be also a reasonable relation between the remedy adopted and the public purpose.* 12 CJ p 929." (Emphasis supplied.)

Michigan cases which have followed the holding in *Carolene Products* are *People* v. *Victor* (1939),

287 Mich 506 (124 ALR 316); *Ritholz* v. *City of Detroit* (1944), 308 Mich 258; *Levy* v. *City of Pontiac* (1951), 331 Mich 100; *Shakespeare Company* v. *Lippman's Tool Shop Sporting Goods Co.* (1952), 334 Mich 109; *Arlan's Department Stores, Inc.,* v. *Attorney General* (1964), 374 Mich 70; and *Grocers Dairy Company* v. *Department of Agriculture Director* (1966), 377 Mich 71.

In *People* v. *Victor,* the Court held unconstitutional a State statute which prohibited the giving of premiums with the sale of petroleum products. Justice DETHMERS, writing in *Shakespeare Company* v. *Sporting Goods Co.,* described the holding in *Victor* as follows (pp 112, 113):

"We there held a statute forbidding the giving of a premium with the retail sale of gasoline unconstitutional under Constitution 1908, art 2, § 16, as constituting a deprivation of property without due process of law for the reason that the legislation was outside the scope of the police power of the State inasmuch as it bore no reasonable relation to public morals, health, safety or the general welfare. Whether the statute prohibits, despite the absence of any contractual inhibition, the giving of such premium with a retail sale or prohibits the sale, by a nonsigner, of an article below the price fixed by the manufacturer is of small moment. The principle involved and the effect are the same."

In *Grocers Dairy Company* v. *Department of Agriculture Director, supra,* the latest pronouncement by this Court, a State statute was held unconstitutional which prohibited the sale of milk in one gallon containers. The regulations of the statute were held to be unreasonable and capricious, leading to the inevitable conclusion that there was no reasonable relationship between the public purpose and the remedy adopted.

In *Taber* v. *State Board of Registration and Examination in Dentistry,* decided by the Supreme Court of New Jersey in 1948, 135 NJL 255 (51 A2d 250), reversed on other grounds, 137 NJL 161 (59 A2d 231), conforming opinion, 137 NJL 392 (60 A2d 290), modified, 1 NJ 343 (63 A2d 535), appeal dismissed, 337 US 922 (69 S Ct 1172, 93 L ed 1730), a New Jersey statute authorized the suspension of a license of a dentist because he was leasing office equipment. The Court held the statute to be void and said (pp 255, 256):

"The statute so far as subdivision (h) is concerned is unconstitutional. In the interest of the public, the practice of dentistry may be regulated. The public has no interest in the financial arrangements a dentist may make as to his office and equipment. It is requisite that those practicing a profession have skill. A leased chair and drill are as useful in the hands of a skilled dentist as the same articles covered by a chattel mortgage which the act permits. Many a professional man has his start in the use of another's office and equipment.

"The legislation in question is an encroachment upon the liberty of the individual which cannot be upheld on the ground of a valid exercise of the police power."

In the case *Berry* v. *Summers* (1955), 76 Idaho 446 (283 P2d 1093), operators of dental laboratories who were not dentists but dental mechanics or technicians brought action against the commissioner of law enforcement of the State of Idaho for a declaratory judgment seeking declaration of unconstitutionality of a statutory amendment which included in the definition of the practice of dentistry the constructing, correcting, and repairing of dental prosthetic appliances or dentures. The dental mechanics or technicians undertook no work on a patient and did not fit the dentures into the mouth. Their work was en-

tirely undertaken in their laboratories and consisted of making dental plates and repairs and additions to dental plates. Under the 1953 amendment to the Idaho law the practice of dentistry was by definition enlarged to include constructing, correcting, repairing or relining a dental appliance or denture. The act further provided that the practice of dentistry as so defined should not be construed to prohibit a person, (1) in the employ of a dentist, (2) engaged under an authorization from a dentist, or (3) in the employ of a person engaged under an authorization from a dentist, from performing or supervising the mechanical operations involved in the construction, correction, repair or relining of a dental prosthetic appliance, or denture, but only if such person returned the appliance or denture to his employing dentist or to the dentist who issued the authorization. The court found that the amendment also required the dental mechanic or technician who performed mechanical work upon inert matter in a dental laboratory direct for wearers of dentures to have the education and training of a dentist and to be licensed as a dentist. The court held the 1953 statutory amendment violated the Constitution of Idaho* and the Fourteenth Amendment. It said any such educational requirement and licensing as a dentist as a prerequisite for performance of such services as the dental mechanics or technicians performed was not a reasonable regulation and not reasonably necessary for the protection of the public.

The legislation involved in this case is neither reasonable nor rational because there is no necessary or consequential relationship between *ownership* of 25% of the stock of a corporation and the control, management and operation of the business and property of that corporation. Stock of a corporation is issued to provide capital, not management. A stock-

---

* Idaho Const 1890, art 1, §§ 1, 13.—Reporter.

holder, as such, has no control over the conduct of a corporate business nor is he required or permitted to engage in the activities of a corporation by virtue of stock ownership.

While it is true that a stockholder may indirectly exercise some influence upon corporate operations, this result is not assured unless he owns over 50% of the stock. Insofar as all of his actual incidents of stock ownership go, he can be completely removed from the corporate operation to the extent of living in Timbuktu just as well as in Michigan.

Undoubtedly, because of the public interest involved in the proper operation and control of drug stores, and pharmacists, the legislature can license, control and regulate the drug business and the operation of drugstores; but such a result is not accomplished by this statute. In *Liggett Co.* v. *Baldridge* (1928), 278 US 105 (49 S Ct 57, 73 L ed 204), where the attempt was to require 100% ownership of corporations by pharmacists, the United States Supreme Court said (p 113):

"mere stock ownership in a corporation, owning and operating a drug store, can have no real or substantial relation to the public health."

See, also, *Evans* v. *Baldrige,* 294 Pa 142 (144 A 97); *Pratter* v. *Lascoff,* 261 NY 509 (185 NE 716); *State* v. *Peoples Drug Stores, Inc.,* 36 Del 120 (172 A 257); *Snyder's Drug Stores, Inc.,* v. *State Board of Pharmacy,* 268 Minn 8 (127 NW2d 682). The above words of the United States Supreme Court and its reasoning in that case are fully applicable here.

While I am of the opinion that the requirement of 25% stock ownership by pharmacists in a corporation carrying on a drug business as a matter of law bears no reasonable or rational relationship to the regulation of the business, nevertheless I cannot agree with Justice Dethmers that the record in this

case contains facts which will support an opinion that there is a reasonable relationship between the statute's stock ownership requirement and public health and safety. Judge Creighton Coleman, appointed by this Court to take the proofs in this case, specifically found to the contrary. His finding of fact is as follows:

"On the basis of the testimony and record in this case, it is clear that the basic protection to the public in the practice of pharmacy is through the individual pharmacist. A 25% stock ownership does not, in Michigan, give any significant management control. While one can theorize about professional conduct, stock ownership and codes of ethics, the basic protection to the public is the conduct of the individual pharmacist.

"On the basis of the record before this court, the court does not find that an act requiring that registered pharmacists hold 25% of the stock of a corporation owning a drug store bears a reasonable relation to the health, safety and morals of the people of the State of Michigan."

An examination of the testimony of the experts reveals that while they had extensive backgrounds in pharmacy they readily confessed their ignorance of stock ownership, of corporate control, structure, or management. Consequently, they failed to qualify as experts with regard to the point at issue. The finding of Judge Coleman is amply supported by the record.

## II.

Even if it should be conceded that the 25% stock ownership requirement is valid, the statute cannot be upheld because it carves out from the 25% stock ownership requirement a favored, self-perpetuating and expanding class of corporations that need never fulfill this requirement. It provides:

"* * * except that any corporation, organized and existing under the laws of the State of Michigan, or any other State of the United States, authorized to do business in the State of Michigan and empowered by its charter to own and conduct pharmacies, drug stores or apothecary shops and which, at the time of the passage of this act, owns and conducts a drug store or stores, pharmacy or pharmacies, apothecary shop or shops in the State of Michigan may continue to own and conduct the same and may establish and own additional pharmacies, drug stores or apothecary shops in accordance with provisions of this article."

Equal protection of the law and the full extent of its sweep was recently stated by Justice SOURIS in *Brouwer* v. *Kent County Clerk,* 377 Mich 616, 643, as follows:

"The equality clause, as our judicial history tells us, is not limited only to the protection of those fundamental rights that are granted by the Federal Constitution or otherwise protected by it; rather, it extends its protective cover to all rights, whether granted by Federal or State Constitutions, congressional or legislative enactments, executive order or otherwise, and against all forms of State action, executive, legislative, or even judicial. *Ex Parte Virginia* (1880), 100 US 339 (25 L ed 676); *Louis K. Liggett Co.* v. *Lee* (1933), 288 US 517 (53 S Ct 481, 77 L ed 929, 85 ALR 699); *Hillsborough Township* v. *Cromwell* (1946), 326 US 620 (66 S Ct 445, 90 L ed 358); *Shelley* v. *Kraemer* (1948), 334 US 1 (68 S Ct 836, 92 L ed 1161, 3 ALR2d 441); *Wheeling Steel Corp.* v. *Glander* (1949), 337 US 562 (69 S Ct 1291, 93 L ed 1544); *Dowd* v. *United States, ex rel. Cook* (1951), 340 US 206 (71 S Ct 262, 95 L ed 215, 19 ALR2d 784); *Barrows* v. *Jackson* (1953), 346 US 249 (73 S Ct 1031, 97 L ed 1586); *Brown* v. *Board of Education of Topeka* (1954), 347 US 483 (74 S Ct 686, 98 L ed 873, 38 ALR2d 1180); *Pennsylvania* v.

*Board of Directors of City Trusts of the City of Philadelphia* (1957), 353 US 230 (77 S Ct 806, 1 L ed 2d 792) ; *Morey* v. *Doud* (1957), 354 US 457 (77 S Ct 1344, 1 L ed 2d 1485).''

The above cited case of *Morey* v. *Doud* (1957), 354 US 457 (77 S Ct 1344, 1 L ed 2d 1485), is of particular significance here. The Illinois community currency exchanges act provided for licensing, inspection, bonding and regulation of currency exchanges engaged in the business of issuing or selling money orders. It forbade them to do business on the premises of any other business. The act exempted from all of its provisions money orders sold or issued by the American Express Company. In holding that the act denied the equal protection of the laws guaranteed by the Fourteenth Amendment to persons operating a currency exchange and issuing and selling money orders, the Court said (p 466) :

"The provisions in the Illinois act, such as those requiring an annual inspection of licensed community currency exchanges by the State auditor, make it clear that the statute was intended to afford the public *continuing* protection. The discrimination in favor of the American Express Company does not conform to this purpose."

In *Morey* v. *Doud* the Court cited with favor *Mayflower Farms, Inc.,* v. *Ten Eyck* (1936), 297 US 266 (56 S Ct 457, 80 L ed 675), in which case a statute granted a differential from the regulated price at which dealers could sell milk, to those dealers in a specified class who were in business before April 10, 1933. In that case the Court said (pp 273, 274) :

"We are referred to a host of decisions to the effect that a regulatory law may be prospective in operation and may except from its sweep those presently engaged in the calling or activity to which it is directed. Examples are statutes licensing physi-

cians and dentists, which apply only to those entering the profession subsequent to the passage of the act and exempt those then in practice, or zoning laws which exempt existing buildings, or laws forbidding slaughter houses within certain areas, but excepting existing establishments. The challenged provision is unlike such laws, since, on its face, it is not a regulation of a business or an activity in the interest of, or for the protection of, the public, but an attempt to give an economic advantage to those engaged in a given business at an arbitrary date as against all those who enter the industry after that date."

In *Stimson* v. *The Muskegon Booming Company,* 100 Mich 347, by statute, the dividend for stockholders of booming companies was to be 12% but if the corporation had sustained losses in previous years, or had not made profit equal in amount to 12% on its capital stock, the corporation could charge a sum sufficient to yield a profit of 24% on its capital stock. Such a company was permitted to receive from its patrons a rate of toll sufficient to equal a profit of 24%, while another company doing business upon the same stream but which had had prudent management would realize only 12%. Speaking of the constitutionality, the Supreme Court said:

"This is class legislation.   *   *   *

"It is not possible that   *   *   *   the legislature *   *   *   confer upon one corporation rights which, under precisely similar circumstances, it denies to another, or greater rights and privileges upon one than are conferred upon another. It will not do to say that the past prosperity of the company organized under the law is a sufficient reason for denying to such corporation the privileges which are vested in another. This is, in effect, to deprive the company of rights because, by its thrift and good management, it has been prosperous."

The Court held the statute unconstitutional as being class legislation.

In *Brown* v. *Judge of Superior Court of Grand Rapids,* 145 Mich 413, the Court declared unconstitutional a State statute providing for licensing transient merchants, which included corporations and which authorized the city council or the council of any village to suspend the operation of the statute in any particular case where they saw fit so to do.

In *Woodward* v. *Pere Marquette Railway Co.,* 312 Mich 67, a statute requiring railroad companies to furnish employees, whose duties related to the immediate transportation of passengers or their baggage, with a uniform, hat or cap and distinguishing badge, but which did not impose a like burden upon competing public carriers, was summarily condemned as being class legislation.

In *Sullivan* v. *Graham,* 336 Mich 65, a statute provided for the licensing of residential builders and maintenance and alteration contractors, but specifically exempted from licensing provisions were operations by or for trustees, banks, trust companies, building and loan associations, or savings and loan associations. The Court, in reviewing a number of important out-of-State decisions, said (pp 69–71):

"The principle concerning unjust discrimination contended for by plaintiff has been considered in other States.

" 'That part of the act of April 21, 1896, entitled "An act to promote the public health and regulate the sanitary construction of house drainage and plumbing," which requires any plumber, whether master or employing plumber or journeyman, before engaging in the business, to undergo an examination as to fitness, and obtain a license, but permits all members of a firm to pursue the business where one only has procured such license, and all members of a corporation to pursue it where the manager only has

procured such license, does not operate equally upon all of a class pursuing the calling under like circumstances, and is invalid.' *State* v. *Gardner* (Syllabus by the court.), 58 Ohio St 599 (51 NE 136, 41 LRA 689, 65 Am St Rep 785).

"The supreme court of Georgia, in reference to an ordinance of the city of Atlanta, in regard to licensing persons who engage in or work at the business of plumbing,

" '*Held,* (a) that this ordinance, in case of a firm or corporation, where one member of the firm or the manager of the corporation has been licensed, permits others than the member or manager so licensed, by virtue of such license, to engage in or do the work of plumbing in the city of Atlanta without standing an examination as to fitness and obtaining a license, but does not permit a like privilege to persons other than those referred to in the 2 instances above stated.

" '(b) The ordinance referred to is discriminatory in character, and is therefore unconstitutional.' *Henry* v. *Campbell,* 133 Ga 882 (67 SE 390, 27 LRA NS 283, 18 Ann Cas 178).

"The supreme court of Mississippi held invalid an ordinance of the city of Vicksburg, concerning which, among other things, the court says (*City of Vicksburg* v. *Mullane,* 106 Miss 199, 217 [63 So 412, 50 LRA NS 421]) :

" 'This ordinance imposes special restrictions and burdens on some and grants special privileges to others engaged in the same work in Vicksburg. All the plumbers in that city are not required to stand the examination and incur the expenses of a license fee. This burden is not placed on those working for a corporation where an officer qualifies or on a firm where one member procures license. It is imposed upon those like Mr. Mullane, laboring alone, doing his work by his own hands.'

"The court further says, page 218 :

" 'This ordinance does not operate equally upon Mr. Mullane and all other plumbers in that city. It is discriminatory as to him.'

" 'Chapter 356, p 575, Laws 1901, which requires journeymen plumbers to take an examination and procure a certificate of competency, *held* unconstitutional, being in contravention to sections 33 and 34, article 4, of the Constitution. An arbitrary basis of classification is adopted in restricting the application of the act to cities of 10,000 inhabitants, or more, which have a system of sewer or waterworks, and an arbitrary and unjustifiable distinction is made between master plumbers and journeymen plumbers.' *State, ex rel. Chapel,* v. *Justus* (Syllabus by the court.), 90 Minn 474 (97 NW 124).

" 'The equal protection of the law is denied by Laws 1897, c. 338, requiring licenses for plumbers on examination, but providing, "in the case of a firm or corporation, the examination or licensing of any one member of the firm or the manager of the corporation shall satisfy the requirements of this act." ' *State, ex rel. Winkler,* v. *Benzenberg,* 101 Wis 172 (76 NW 345, syllabus).

"It was held in effect in *State* v. *Hinman,* 65 NH 103 (18 A 194, 23 Am St Rep 22), that a license fee cannot in view of the constitutional objection be imposed upon certain persons where others of the same class and profession are exempt under similar circumstances and conditions."

The Court held that since corporations within the named groups were entirely exempted from obtaining a license before they built on any property to which they held title or had an equitable title, or in which they had a financial interest, the statute unjustly discriminated in their favor and violated the equal protection clause and due process clause of the Federal Constitution, and the due process clause of our State Constitution.

In *Palmer Park Theatre Company* v. *City of Highland Park,* 362 Mich 326, Justice T. M. KAVANAGH, writing for a majority of the Court, dealt with the problem we face here in some detail which merits repeating (pp 345–348):

"The first question is: Is the ordinance arbitrary and discriminatory and, therefore, unconstitutional by reason of failing to treat all within the class equally?

"The legislation in this instance was aimed at water conservation, a perfectly legitimate objective for the legislative body. Following the drought situation in 1955, the legislative body was confronted with a very perplexing problem. It had not only a right but a duty to deal with the problem, but its power was not unlimited. This power was governed by constitutional restrictions, including the equal protection of the law provisions of the State and Federal constitutions. The actions could not be arbitrary, unjust and discriminatory with reference to the classification to which the penalty provisions of the ordinance were to apply.

"Let us consider the facts as they existed. At the time of trial, of the total 3,000 tons of water-cooled nonrecirculating air-conditioning equipment in Highland Park, 1,200 tons — 40% — was within the untaxed and unrestricted category of less than 5 tons. Admittedly, ton for ton, the smaller units consumed just as much water as the larger units. The ordinance thus applied its punitive features to only a part of the users of water-cooled nonrecirculating equipment, while permitting a substantial portion of that group or class of users of nonrecirculating air-conditioning equipment to be free from the penalties of the ordinance.

"We are not discussing here or deciding whether there ought to be included in this class a myriad of other water-consuming and nonconserving equipment (swimming pools, dishwashers, laundry ma-

chines, et cetera) neither are we making reference to the fact that lawn sprinkling alone in Highland Park consumes double the water used by the air-conditioning equipment here in question, nor that it operates without bearing a similar burden to that imposed by this ordinance. Parenthetically, it might be pointed out that shifting of lawn sprinkling periods or the elimination of lawn sprinkling would impose no great, irreparable injury or pecuniary damage.

"This Court, speaking of the equal protection of the laws provisions of the State and Federal constitutions, stated in *Cook Coffee Co.* v. *Village of Flushing,* 267 Mich 131, 134:

" 'These constitutional provisions do not mean that there can be no classification in the application of statutes and ordinances, *but only that the classification must be based on natural distinguishing characteristics and must bear a reasonable relation to the object of the legislation.'* (Emphasis supplied.)

"In *Peninsular Stove Co.* v. *Burton,* 220 Mich 284, this Court held invalid as class legislation a statute regulating the installation of warm-air heating plants enclosed in galvanized sheet iron. The Court pointed out (p 287):

" 'We have, therefore, not only the selection of a class of heating plant *but of a class of this class.* To justify such action it must appear that some substantial reason existed for the regulation of this particular kind of heating plant not equally applicable to the others.' (Emphasis supplied.)

"As to this classification within a classification, the Court concluded (p 288):

" 'It seems clear to us that the classification here made is not based upon any real or substantial distinction.'

"The general rule is stated in *Mulloy* v. *Wayne County Board of Supervisors,* 246 Mich 632, 638, where this Court quoted with approval the following language:

" ' "The classification must be based upon substantial and real differences in the classes, *which are germane to the purpose of the law and reasonably suggest the propriety of substantially different legislation,* the legislation must apply to each member of the class, and the classification must not be based on existing circumstances only, but must be so framed as to include in the class additional members as fast as they acquire the characteristics of the class." *Bingham* v. *Board of Supervisors,* 127 Wis 344 (106 NW 1071).' (Emphasis supplied.)

"In *Haynes* v. *Lapeer Circuit Judge,* 201 Mich 138, 141, 142 (LRA 1918D, 233), this Court said:

" 'It is elementary that legislation which, in carrying out a public purpose for the common good, is limited by reasonable and justifiable differentiation to a distinct type or class of persons is not for that reason unconstitutional because class legislation, if germane to the object of the enactment and made uniform in its operation upon all persons of the class to which it naturally applies; *but if it fails to include and affect alike all persons of the same class, and extends immunities or privileges to one portion and denies them to others of like kind,* by unreasonable or arbitrary subclassification, it comes within the constitutional prohibition against class legislation.' (Emphasis supplied.)

"The attempt to regulate a portion of the class under the ordinance in the instant case constitutes an arbitrary and discriminatory classification and denies the equal protection of the laws."

*Beauty Built Construction Corporation* v. *City of Warren,* 375 Mich 229, involved a classification adopted in a home-rule-city ordinance and a resolution passed on January 13, 1959, whereby no sewer tap-in fee would be required as to structures in existence but not connected at the time of the adoption of the ordinance, but a graduated fee would be charged for those thereafter erected. Chief Justice T. M. KAVANAGH, writing for the Court, said:

"In the case before us no reasonable or rational foundation has been submitted to support the exemption and classification created by the ordinance. The date January 13, 1959, seems to have been chosen simply because it was the date defendant city decided to begin raising additional revenues. It certainly was not chosen because it formed a reasonable or rational date for establishing a division of a class."

The resolution and the ordinance were held to create an arbitrary and discriminatory classification of persons contrary to the equal protection clauses of the Fourteenth Amendment and the State Constitution.

Persons, as distinguished from corporations, who are benefited by the grandfather clause in this case must in time go out of existence. Individuals who were not registered pharmacists when the act went into effect, or their widows, will die; administrators, executors or trustees of estates of deceased owners must eventually wind up those estates; but the life of a corporation is in no way limited by the statute and' Michigan corporations are free to perpetuate themselves in perpetuity under PA 1963 (2d Ex Sess), No 26 (CL 1948, § 450.371 [Stat Ann 1965 Cum Supp § 21.284(1)]). The statute cannot ever achieve what it sets out to accomplish—25% stock ownership in corporations by pharmacists—because those corporations that are accorded favored treatment not only can perpetuate themselves but can expand and proliferate their operations without limit.

### III.

The statute does not achieve its purported purpose. It creates an unfair and discriminatory classification. The statute is unconstitutional under the Fourteenth Amendment of the Constitution of the

United States. It is also unconstitutional under the equivalent provision of the Michigan Constitution of 1963 (art 1, § 2). Since the pharmacy board does have supervisory and licensing powers under the law, I cast my vote for issuance of the writ of mandamus for the reasons set forth by Justice O'HARA.

SOURIS, J., concurred with ADAMS, J.

BLACK, J. (*dissenting*). Appearing in the first of these Superx presentations are those specific rules governing judicial review of administrative decisions which, so far, this Court has not disavowed openly (372 Mich 22, 41–44). By this separate opinion the undersigned means to point them up again lest judicial usurpation of the administrative functions of our many licensing boards and agencies become an unchallenged commonplace of random judicial choice.

When this original action was instituted, in 1962, the administrative functions of present concern were vested exclusively with the defendant board of pharmacy by the act of 1885 as amended. They are now so vested by the act of 1962 as amended. See PA 1885, No 134 as amended (CL 1948 and CLS 1961, § 338.401 *et seq.* [Stat Ann 1956 Rev § 14.721 *et seq.*]), which act was repealed and replaced by PA 1962, No 151 (CL 1948, § 338.1101 *et seq.* [Stat Ann 1965 Cum Supp § 14.757(1) *et seq.*]) as amended by PA 1965, No 163. The defendant board has now been transferred "by a type I transfer" to the new department of licensing and regulation. See PA 1965, No 380, § 327, as amended by PA 1965, No 407 (CL 1948, § 16.427 [Stat Ann 1965 Cum Supp § 3.29 (327)]), and § 504 (CL 1948, § 16.604 [Stat Ann 1965 Cum Supp § 3.29(504)]), effective, pursuant to executive order, January 1, 1966. I shall allude

to all but the last of these cited statutes, and also to the constitutionally assailed act (PA 1927, No 359, CL 1948, § 338.481 [Stat Ann 1956 Rev § 14-.771]) according to the respective years of their enactment.

The administrative decision under present review[1] should be reversed upon determination that the act of 1927, by force of which the defendant board denied plaintiff's application for license, was from the beginning violative of the Federal guarantee of due process. Our order should be limited to reversal with remand for reconsideration of plaintiff's said application in the light of such a determination of unconstitutionality. As against this view some yet unknown number of Justices propose by peremptory writ to compel issuance of a pharmacy license to plaintiff without regard for the defendant board's continuing jurisdiction to grant, deny, withhold, revoke, suspend, or grant upon condition, pharmacy licenses and certificates according to the administrative authority which by the currently effective act of 1962 is vested exclusively with the board.

Such proposed writ will, if issued and served, brook no discretion of the board to consider or reconsider the already administratively ascertained "violations" by plaintiff which occurred in *1965* (see appendix for full quotation). It will determine that what the board found with respect to such 1965 violations is a nullity the board no longer may employ or consider so far as this plaintiff is concerned. Thus such an issued and served writ will provide for plaintiff an overt advantage over other licensees and future applicants; an advantage of the kind

---

[1] If the Court's majority order of May 10, 1965 (375 Mich 314) is to mean effectively what it says, the matter before us no longer is original mandamus. It has become a specially authorized "appeal" from "the determination entered December 16, 1965 by the Michigan Board of Pharmacy." The quotation is from plaintiff's claim of appeal to this Court, filed January 3, 1966.

renounced by the Court in the presently cited *Potts-
ville Case.*

Let us re-examine *Federal Power Commission* v.
*Idaho Power Company,* 344 US 17, 20 (73 S Ct
85, 97 L ed 15) (quoted by the writer previously,
372 Mich at 41):

"When the court [court of appeals for the District
of Columbia circuit] decided that the license should
issue without the conditions, it usurped an adminis-
trative function.  There doubtless may be situations
where the provision excised from the administrative
order is separable from the remaining parts or so
minor as to make remand inappropriate.  But the
guiding principle, violated here, is that the function
of the reviewing court ends when an error of law
is laid bare.  At that point the matter once more goes
to the commission for reconsideration (citing
cases).";

along with the principal decision upon which *Federal
Power's* quoted rule was based, that is, *Federal
Communications Commission* v. *Pottsville Broad-
casting Co.,* 309 US 134 (60 S Ct 437, 84 L ed 656).
In the *Pottsville Case* Mr. Justice Frankfurter,
writing for the Court, declared that "On review the
court may thus correct errors of law and on re-
mand the commission is bound to act upon the cor-
rection."  Then he went on (p 145):

"But an administrative determination in which is
imbedded a legal question open to judicial review
does not impliedly foreclose the administrative
agency, after its error has been corrected, from en-
forcing the legislative policy committed to its
charge.   *   *   *

"The court of appeals laid bare that error, and
in compelling obedience to its correction, exhausted
the only power which congress gave it.  At this
point the commission was again charged with the
duty of judging the application in the light of 'public

convenience, interest, or necessity.' The fact that in its first disposition the commission had committed a legal error did not create rights of priority in the respondent, as against the later applicants, which it would not have otherwise possessed. Only congress could confer such a priority. It has not done so."

Note, in passing, the Supreme Court's summary disposition of *Pottsville's* objection "that if all matters of administrative discretion remain open for determination on remand after reversal, a succession of single determinations upon single legal issues is possible with resulting delay and hardship to the applicant." Against that objection is arrayed the rather necessary rule that when judicial review of an administrative decision granting or denying license or permit is sought and obtained, the court limits its function to ascertainment of the presence or absence of assigned errors of law and correction of such errors when same are discovered. The short of it is that courts are not authorized to grant, deny, or revoke licenses and permits, directly or by the indirection of peremptory writs. In administrative cases they review and correct legal errors and leave the rest of the administrative process to the statutorily appointed administrator or administrators, subject always to further review as permitted by law.

### First: The Grandfather Clause and the Administrative Findings Pertaining Thereto.

Quoted in Justice O'Hara's opinion are such of the administrative findings and conclusions as to the defendant board were determinative that plaintiff's insistence upon grandfather rights, under the Act of 1927, should be denied. The facts found in such regard are amply sustained by proof which

the board, only the board, was entitled to weigh, evaluate, and record as factually determinative. Such findings legally support the board's denial of plaintiff's said application provided the final question, now here for the first time,[2] is due for an affirmative answer. To this point of administrative law see *Unemployment Compensation Commission of Alaska* v. *Aragon,* 329 US 143, 153, 154 (67 S Ct 245, 91 L ed 136):

"Here, as in *National Labor Relations Board* v. *Hearst Publications, Inc.* (1944), 322 US 111, 131 (64 S Ct 851, 88 L ed 1170, 1184), the question presented 'is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially.' To sustain the commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings. The 'reviewing court's function is limited.' All that is needed to support the commission's interpretation is that it has 'warrant in the record' and a 'reasonable basis in law.' *National Labor Relations Board* v. *Hearst Publications, Inc., supra; Rochester Telephone Corporation* v. *United States* (1939), 307 US 125 (59 S Ct 754, 83 L ed 1147)."

*Second: The Constitutional Question.*

Justice Adams has considered this question at length. I agree with his view that the act of 1927 is unconstitutional, yet prefer to declare my concurrence in more limited terms; terms confined strictly to the intent of this pharmacy *ownership* statute the better to ascertain whether it alone,

---

[2] This "final question," whether PA 1927, No 359, is constitutionally valid, was not raised before the board on the previous occasion. See 372 Mich at 30. Now, as all parties agree, it was raised below and is here for review.

tested for Federal due process, bears a "real and substantial relation" to the public health.

From an unnumbered multitude of "reasonable relation" cases, wherein legislative purpose has been tested for evidence of protection of the public health, a judge may bolster his own adjudicatory purpose by selecting with care specific quotations of judicial discovery that this or that law does or does not disclose the constitutionally essential "reasonable" relationship. But when that judge is seated on the bench of a subordinate court, he is not free to thus pick and choose when a court to which he owes obedience has definitely determined the question he must decide, in the exact substance of fact which confronts him, and has not overruled that determination. Then the judge is constitutionally disabled from predicting, and from proceeding upon strength of such a prediction, that his superior will overrule or ignore what was supremely determined. Obedience, not forecast, is the order of the day.

The possibility of reversal by overrulement is no factor of persuasion in favor of prophecy. Things are just the other way around. Reversal in such instance spells honor rather than dishonor of the judge who stands upon law as it is written rather than his estimate of what the law might become on review. See the concluding paragraphs of *Bricker* v. *Green,* 313 Mich 218 at 236 (163 ALR 697).

The act of 1927 discloses no indicia of any legislative purpose except that of regulation of the *ownership* of pharmacies, drug stores and apothecary shops. The other and more mature act (of 1885), and now the successor thereof (of 1962), were designed alike to and have comprehensively regulated the *practice* of pharmacy. Hence from the beginning the acts of 1885 and 1962 have provided all—and much more—safeguards of the public health than any that might be claimed for the act of 1927. Here

the controlling decision of *Liggett Co.* v. *Baldridge,* 278 US 105 (49 S Ct 57, 73 L ed 204) comes into play.

The parallelism of the 1927 Pennsylvania statute held null by *Liggett,* with the 1927 Michigan statute examined here, is something more than striking. So is the parallelism of the earlier statutes of Pennsylvania (analyzed in *Liggett* at 112, 113) with the earlier (1885 as amended) statute of Michigan. These compared earlier statutes dictate our saying, of the circumstances subsisting when the legislature considered the act of 1927,[3] the same as was said by the Supreme Court of the corresponding circumstances in Pennsylvania when that State's assembly considered her said act of 1927 (*Liggett* at 113):

"Thus, it would seem, every point at which the public health is likely to be injuriously affected by the act of the owner in buying, compounding, or selling drugs and medicines is amply safeguarded."

This was the first point made by the Court in *Liggett* in support of its conclusion that the act of Pennsylvania bore no "real and substantial relation" to the public health. The next and final point made by the Court is disclosed best by quotation which requires no comment or discussion (*Liggett* at 113, 114):

---

[3] In *Wayne County Board of Road Commissioners* v. *Wayne County Clerk,* 293 Mich 229, 235, and again in *Husted* v. *Consumers Power Co.,* 376 Mich 41, 54 this Court committed its view to that which seems to have been written for the first time in *Platt* v. *Union Pacific R. Co.,* 99 US 48, 63, 64 (25 L ed 424):

"There is always a tendency to construe statutes in the light in which they appear when the construction is given. It is easy to be wise after we see the results of experience. * * * But in endeavoring to ascertain what the congress of 1862 intended, we must, as far as possible, place ourselves in the light that congress enjoyed, look at things as they appeared to it, and discover its purpose from the language used in connection with the attending circumstances."

"The act under review does not deal with any of the things covered by the prior statutes above enumerated. It deals in terms only with *ownership*. It plainly forbids the exercise of an ordinary property right and, on its face, denies what the Constitution guarantees. A State cannot 'under the guise of protecting the public, arbitrarily interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them.' (Citing cases.)  *   *   *

"We take judicial notice of the fact that the stock in these corporations is bought and sold upon the various stock exchanges of the country and, in the nature of things, must be held and owned to a large extent by persons who are not registered pharmacists. If detriment to the public health thereby has resulted or is threatened, some evidence of it ought to be forthcoming. None has been produced, and, so far as we are informed, either by the record or outside of it, none exists. The claim, that mere ownership of a drug store by one not a pharmacist bears a reasonable relation to the public health, finally rests upon conjecture, unsupported by anything of substance. This is not enough; and it becomes our duty to declare the act assailed to be unconstitutional as in contravention of the due process clause of the 14th Amendment."

Pennsylvania's act of 1927 appears in full at the margin of *Liggett's* report, commencing with the initial paragraph of the Court's opinion. It was approved May 13, 1927. Our Act of 1927 was approved 20 days later, June 2, 1927. Excepting for inconsequential variations of wording designed principally to fit one act to the Commonwealth of Pennsylvania and the other to the State of Michigan, and excepting a requisite of 25% stock ownership by pharmacists in one instance and a requisite of 100% such ownership in the other, the two statutes as enacted were identical of purport, purpose, and

designed intent. Too, the consistently duplicative phrasing of both acts leaves something more than an inference of coincidence. Another kind of grandfather—the hired kind—must have been at work in 1927, among the legislators of both States, selling a plan to regulate the *ownership* of drugstores.

The attorney general insists that *Liggett* should be discarded in favor of other more recent Supreme Court decisions cited by him. He alleges since *Liggett* was handed down that there has been an "obvious change in position of the United States Supreme Court." Whether such change has taken place is a matter of controversial speculation drawn either from left or right reading of such recent decisions, no one of which is factually parallel to *Liggett* or to this case of Superx. Whatever the right of that speculation, the allegation thus made confronts this Court with still another demand that it predict a new interpretation and application of the Federal Constitution by the Supreme Court. I answer with the patience of impatience. When called upon justiciably to do so, an authoritative authority like *Liggett* should be followed and applied by every court of a State until the decision and its reasoning is overruled or modified by the only Court that is authorized to overrule or modify it. That Court is not this Court.

The *Liggett Case* governs today's constitutional question. It is, perforce, something more than a precedent; a precedent which this Court might otherwise be free to accept or reject. Not having been overruled by the Supreme Court, and that Court having expressly distinguished the statute involved in *Liggett* from the one tested by the Court in *Daniel* v. *Family Security Life Insurance Company,* 336 US 220 (69 S Ct 550, 93 L ed 632, 10 ALR2d

945),[4] this Court upon oath is constrained to apply *Liggett* to the aforesaid act of June 2, 1927.

*To summarize:* No part of the title or body of our said Act of 1927 hints at thought for the public health or anything except a legislative determination to regulate the *ownership* of pharmacies, drugstores, et cetera. The "one object" title to the act tells tersely what the exact legislative purpose was; "An act to regulate the ownership of pharmacies, drug stores and apothecary shops, and to provide a penalty for the violation of the provisions of this act." The act discloses no constitutional relationship to the public health, substantial or otherwise; a subject of police power which, when the act was legislatively considered, had already been covered by a comprehensive statute regulating the *practice* of pharmacy. The act was and now is unconstitutional for the same reason as was given by the Supreme Court in *Liggett*. I therefore vote to reverse and remand for administrative reconsideration of plaintiff's pending application for pharmacy license.

T. M. KAVANAGH, C. J., concurred with BLACK, J.

APPENDIX.

(Findings and conclusions of defendant board in re 1965 violations as charged against plaintiff Superx)

---

[4] *Daniel* is the principal authority cited by the attorney general in support of his allegation that *Liggett* should not be followed. The main trouble with his contention lies with this concluding paragraph of *Daniel* (p 225):

"The *Liggett Case,* however, was concerned with a statute far different from the one we are considering now. Pennsylvania required drug store owners to be licensed pharmacists. Because the statute was directed at owners, who might have no connection with the pharmaceutical branches of modern drug stores, a divided Court thought the measure unreasonable. The Pennsylvania statute was clearly less adapted to the recognized evil than the provision now before us. The *Liggett Case,* on its facts, is not authority for the invalidation of the South Carolina mortuary act."

"I. Considering now: Violation of PA 1962, No 151 and board rule 20,[5] as charged in notice of hearing dated September 7, 1965, and attorney general's letter of September 20, 1965.

"1. On July 7, 1965, inspectors of this board Ippolito and Spayde filed a special report with the pharmacy board which was marked 65–1. In this report and in Ippolito's testimony before the board it was stated that at 9:20 o'clock a.m. on July 7, 1965 they entered the Battle Creek store of the Superx Drugs Corporation and found a 21-year old clerk in charge and no registered pharmacist on duty; that the prescription section was blocked off by a short stepladder and three small tables; that there were signs in the store reading, 'Sorry, no prescriptions or sundries sales. Pharmacist sick'; that at 10 o'clock a.m. they ordered the store closed; that they noticed that a door going into the restaurant area was of a canvas accordian type, with a clip lock, poorly locked.

"2. On July 22, 1965, inspectors Ippolito and Spayde made an inspection of the Superx Battle Creek store and filed a report with the board in which they charged that the registered pharmacist in charge of the store had no narcotic license although he had applied for one. They also charged that they found two bottles of outdated (1964) drugs, namely 'Compocillin suspension.' (Exhibit 65–2)

"3. The officers and management of Superx by their own testimony admitted to a complete lack of knowledge regarding the laws governing the practice of pharmacy in this State.

"Further, this testimony demonstrates that the supervision has been very lax. Also, Herbert Herman, previous owner and now store manager for Superx since their purchase to present time, had been arrested for violations of the dangerous drug act on October of 1962 and has yet to be tried.

---

[5] 1963 AACS, § R 338.490.—REPORTER.

"Conclusions of Law, Regarding Foregoing Facts:

"1. Section 14 of PA 1962, No 151 as amended, requires every pharmacy when open for business to be under the personal supervision of a duly licensed and registered pharmacist. The Battle Creek pharmacy of Superx on July 7, 1965, was in violation of this section because no registered pharmacist was in charge while the store was open for business, noting that the whole store is licensed and not just the prescription area.

"2. Section 1(L) (1), Sec. 11, and Sec. 17(m) of PA 1962, No 151, as amended, and board rule 20, 4,[6] require the proprietor of a pharmacy to dispense only pure and unadulterated drugs, the quality of which has not been deteriorated by age. Keeping compocillin suspension which was 16 months outdated on the shelves was dangerous and a violation of the pharmacy act and the rules of the board.

"3. The lack of knowledge regarding the State pharmacy laws, the lack of control and supervision along with Herman's alleged violations, does leave the board to conclude that the operation of the Battle Creek store was not being conducted in the best interest of the public health and safety.

"4. The aggregate of the forementioned violations prove to be a most serious complaint, especially when found in a pharmacy operating under such a delicate situation (re: pending application).

"5. This board has the legal right to withhold a pharmacy license from an applicant who has repeatedly violated the pharmacy statutes of this State, and the rules of professional conduct adopted by the board pursuant to section 6(h) of PA 1962, No 151, as amended. Therefore the foregoing violations could present sound grounds for denial of application, but not forever. However it is the decision of this board that a denial forever based on these grounds would not be well founded."

---

[6] 1963 AACS, § R 338.490.—Reporter.